110 T.C. No. 18


UNITED STATES TAX COURT


MARTIN ICE CREAM COMPANY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 1477-93.                    Filed March 17, 1998.


A and his son M were shareholders of MIC, an S
corporation that distributed ice cream products to
supermarket chains, independent grocery stores, and
food service accounts.  MIC's supermarket business was
largely attributable to the close personal relation-
ships that A had developed and maintained for decades,
beginning before the creation of MIC in 1971, with the
owners and managers of the supermarket chains.  Since
1974, MIC had distributed the ice cream products of HD,
pursuant to an oral agreement entered into between A
and the founder of HD.  In 1987 and 1988, following the
acquisition of HD by a public company, HD initiated
negotiations with MIC to acquire MIC's rights to
distribute HD ice cream products to MIC's customers.
After some but not all terms of the acquisition had
been negotiated in the 1988 negotiations, A and M
caused SIC, a wholly owned subsidiary of MIC, to be
created, and HD was notified that SIC would be the
seller of the assets that HD wished to acquire.  MIC
then transferred to SIC all of MIC's rights to
distribute HD ice cream products to the supermarket

chains and food service accounts, and business records relating thereto, in exchange for all the stock of SIC, and immediately distributed the SIC stock to A in exchange for all of A's stock in MIC. Following further negotiations, A and SIC, 3 weeks thereafter, entered into a contract to sell HD all their intangible assets relating to distribution of HD ice cream products. Two weeks thereafter, following the determination of a purchase price adjustment provided for in the final version of the contract, the sale closed and SIC received the proceeds of sale, which it distributed to A.

1. Held: The benefits of the personal relationships developed by A with the supermarket chains and A's oral agreement with the founder of HD were not assets of MIC that were transferred by MIC to SIC and thereafter sold by SIC to HD; A was the owner and seller of those assets.

2. Held, further, respondent's attempt to apply Commissioner v. Court Holding Co., 324 U.S. 331 (1945), to regard MIC as the seller of assets to HD is rejected because the final sale to HD was on terms that were negotiated with HD by A and SIC that were significantly different from the terms of the earlier proposed transaction under negotiation between MIC and HD.

3. Held, further, MIC's distribution of SIC stock to A was not entitled to nonrecognition of gain under sec. 355, I.R.C., because SIC was not engaged in the active conduct of a trade or business after the distribution of SIC stock to A.

4. Held, further, although MIC's transfer of intangible assets to SIC in exchange for SIC stock was entitled to nonrecognition of gain under sec. 351, I.R.C., the immediate distribution of SIC stock in redemption of A's stock in MIC was a distribution of appreciated property under secs. 311(b) and 317(b), I.R.C., on which recognized gain in the amount of $141,000 is taxable to MIC under sec. 1374, I.R.C.

5. Held, further, MIC is not liable for a negligence addition to tax under sec. 6653(a), I.R.C., but is liable for a substantial understatement addition under sec. 6661, I.R.C.

Frank Agostino, Alan G. Merkin, Mary Ann Perrone, and Susan M. Flynn, for petitioner.

Patricia Y. Taylor and Clare W. Darcy, for respondent.

BEGHE, Judge:  Respondent determined the following deficiency and additions to tax:

|  |  | Additions to Tax | |
| Year | Deficiency | Sec. 6653(a)(1) | Sec. 6661 |
| 1988 | $477,816 | $23,891 | $119,454 |

In so doing, respondent determined that Martin Ice Cream Co. (MIC or petitioner) recognized taxable gain of $1,430,340 on the distribution of stock of its newly created subsidiary, Strassberg Ice Cream Distributors, Inc. (SIC), to one of petitioner's two shareholders, Arnold Strassberg (Arnold), in redemption of his 51-percent stock interest in petitioner.  Shortly before trial, we granted respondent's motion for leave to amend answer to allege that a subsequent sale of assets to the Häagen-Dazs Co., Inc. (Häagen-Dazs), by Arnold and SIC should be attributed to petitioner under Commissioner v. Court Holding Co., 324 U.S. 331 (1945).

We reject respondent's attempt to apply Court Holding, although we uphold respondent's original determination that petitioner recognized gain on the redemption of Arnold's stock in petitioner.  We find that petitioner's gain is substantially less than the gain determined by respondent.  We reject respondent's imposition of an addition to tax under section 6653(a)(1) but

uphold the addition to tax for substantial understatement under section 6661.[1]

## FINDINGS OF FACT

Some of the facts are stipulated and are so found. MIC is a New Jersey corporation whose principal place of business was Bloomfield, New Jersey, when it filed its petition.

MIC was incorporated in 1971 as a wholesale ice cream distributor, with Martin Strassberg (Martin) as its sole shareholder. MIC was a C corporation from 1971 through 1986. On December 30, 1986, MIC filed with the Internal Revenue Service a Form 2553, Election by a Small Business Corporation, which took effect on November 1, 1987. As a result of the election, the accounting period of MIC was changed, commencing January 1, 1988, from an October 31 fiscal year to the calendar year.

Soon after World War II, Arnold, Martin's father, a high school mathematics teacher, began a part-time business after school hours, selling ice cream products wholesale to stores in Newark, New Jersey. During summer vacations, Arnold expanded his coverage to small stores and ice cream parlors on the Jersey Shore. By 1960, Arnold had incorporated his own company, Arnold's Ice Cream, and was engaging full time in the wholesale distribution of ice cream. In the 1960's, Arnold began to

---

[1] All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

develop relationships with the owners and managers of several supermarket chains when he conceived an innovative packaging and sales campaign that used bright colors and catchy slogans to market ice cream products to supermarkets for resale to consumers. Ice cream had hitherto been sold by supermarkets to consumers as an undifferentiated product in large containers and multiserving packages with plain brown wrappers. Arnold subsequently developed other packaging ideas for ice cream products that helped supermarkets sell ice cream products under their private labels. Even with different kinds of packaging, supermarkets marketed ice cream to consumers mainly on the basis of price. In the late 1960's, Arnold had a falling-out with his major supplier, Eastern Ice Cream, which forced Arnold's Ice Cream into bankruptcy.

In 1971, Martin and Arnold organized MIC as a part-time business, with one delivery truck, distributing ice cream to small grocery stores and food service accounts (restaurants, hotels, and clubs) in northern New Jersey. Martin joined the business after having completed virtually all requirements for a Ph.D. in statistics and after spending several years doing operations research and statistical analysis as an employee of large corporations. In 1975, Martin began working in the ice cream distribution business full time. During most of the 1970's, Arnold owned no stock in MIC because he wished to avoid the claims of creditors of Arnold's Ice Cream. In 1979, Arnold

became a 51-percent shareholder in MIC, and Martin's interest was reduced to 49 percent. At no time did Arnold or Martin have an employment agreement with MIC.

In 1974, Ruben Mattus (Mr. Mattus), the founder of Häagen-Dazs, asked Arnold to use his ice cream marketing expertise and relationships with supermarket owners and managers to introduce Häagen-Dazs ice cream products into supermarkets. Häagen-Dazs manufactured an entirely new range of "super-premium" ice cream products that were differentiated from the competition by both higher quality and higher price. Häagen-Dazs had initially marketed its products to small stores and restaurants for single-serving on-premises consumption. Häagen-Dazs had made only minimal inroads into the supermarkets, and now Mr. Mattus wanted to intensify his marketing efforts in that sector. Mr. Mattus asked for Arnold's help because he had been unable to convince the supermarkets to carry his products; they saw super-premium ice cream as too expensive for a retail setting designed for off-premises consumption.

Arnold, as the first distributor of Häagen-Dazs ice cream to supermarkets, sparked a revolution in the retail sale of ice cream. Arnold and Häagen-Dazs tapped a hitherto hidden demand for a super-premium ice cream in supermarkets by consumers who were willing to pay higher prices for higher quality. By the late 1970's, MIC was distributing ice cream products, including Häagen-Dazs ice cream, to four major supermarket chains,

Pathmark, Shop Rite, Foodtown, and Acme in New York, New Jersey, Connecticut, and Pennsylvania (the supermarkets) and to smaller grocery stores.  However, neither Arnold nor MIC ever entered into a written distribution agreement with Häagen-Dazs or Mr. Mattus.

Arnold was so successful that in the late 1970's or early 1980's Mr. Mattus invited Arnold to become his partner in a planned expansion of Häagen-Dazs' supermarket sales to the West Coast.  Arnold declined the offer and continued to use MIC as his corporate vehicle to distribute Häagen-Dazs products in New Jersey and adjacent areas.

Martin did not support or participate in Arnold's efforts to expand ice cream distribution to the supermarkets.  Martin disliked the social activities necessary to developing and sustaining personal relationships with supermarket owners and managers--activities that Arnold thrived on.  Martin preferred to manage day-to-day operations at the MIC warehouse, arriving at work as early as 3 to 4 a.m. to supervise the loading of MIC's delivery trucks for delivery to the supermarkets and the small stores.[2]  Martin employed route salesmen to expand and maintain wholesale distribution of ice cream, primarily Häagen-Dazs, to small independent grocery stores and food service accounts in New

---

[2] Häagen-Dazs delivered its products to the MIC warehouse, where they were transferred to MIC trucks for delivery to both the supermarkets and the small grocery stores and food service accounts.

Jersey and New York. Martin did little or no solicitation himself. Arnold did not participate in Martin's development of the business of wholesale ice cream distribution to small grocery stores and food service accounts, focusing instead on the supermarkets.

In 1985, the Borden Co. (Borden) retained Arnold to use his contacts with the supermarkets to put Borden's ice cream products into supermarket freezers. Arnold worked as a broker for Borden, personally earning commissions on Borden's sales of ice cream products to supermarkets, rather than as a distributor buying from the manufacturer and reselling to retailers. MIC did not participate in Arnold's work for Borden. Arnold had the ability to--and did--put Borden's ice cream products into supermarket freezers at a time when many of his original contacts from the 1960's and earlier had passed from the scene. By 1988, Arnold no longer had a business relationship with Borden.

At some time in the early to mid-1980's, Ben and Jerry's, a competitor of Häagen-Dazs in the manufacture and marketing of super-premium ice cream, asked Arnold to help obtain supermarket freezer space for its products. Häagen-Dazs had not objected to Arnold's work for Borden but told him that he could not continue to distribute Häagen-Dazs ice cream products if he were to distribute Ben and Jerry's ice cream products. Arnold thereupon terminated further contact with Ben and Jerry's.

In 1983, the Pillsbury Co. (Pillsbury) purchased Häagen-

Dazs from Mr. Mattus. Pillsbury promptly initiated a business plan to consolidate the distribution of Häagen-Dazs ice cream products into its own distribution centers, with the goal of delivering directly to retail stores, especially large supermarket chains. Pillsbury believed it could deliver a uniformly higher quality product to supermarkets at lower cost than independent distributors whose refrigeration equipment was not as reliable. Pillsbury believed that ensuring high quality was vital to its basic corporate strategy of continuing to differentiate Häagen-Dazs products from those of its competitors.

Another important component of the Häagen-Dazs corporate strategy was to enter into written distribution contracts, explicitly terminable at will by Häagen-Dazs on short notice, with distributors that it was not ready to buy out. Since 1974, MIC, like other regional distributors, had distributed Häagen-Dazs products on the basis of Arnold's original oral agreement with Mr. Mattus. After its acquisition by Pillsbury, Häagen-Dazs always maintained that distributors such as MIC did not have enforceable rights to continue to distribute Häagen-Dazs ice cream. In June 1988, the U.S. District Court, Northern District of California, MDL docket No. 682, ordered summary judgment in favor of Häagen-Dazs against a terminated distributor who had distributed ice cream products for a direct competitor.[3] The

---

[3] In re Super Premium Ice Cream Distribution Antitrust Litig., 691 F. Supp. 1262 (N.D. Cal. 1988), affd. without

(continued...)

grounds were that the termination did not violate antitrust laws and that the oral agreement with the distributor did not prevent termination at will.[4]

In late 1985 or early 1986, representatives of Häagen-Dazs first approached the Strassbergs about acquiring direct access to Arnold's relationships with the supermarkets and removing him as a middleman in the chain of distribution. Häagen-Dazs also wanted to forestall competitors, such as Ben and Jerry's, from using Arnold's contacts and knowledge to gain access to the supermarkets. Häagen-Dazs also did not want to leave distributors like Arnold, who had been with Häagen-Dazs since the early days of Mr. Mattus, without adequate reward for the role they had played in bringing Häagen-Dazs to prominence. Also, because Arnold was a high-profile, well-respected ice cream distributor, Häagen-Dazs did not wish to alienate Arnold and risk having him stir up the other independent distributors before Häagen-Dazs was ready to take similar steps against them. Häagen-Dazs believed that these various relationships, personal

---

[3](...continued)
published opinion sub nom. Häagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc., 895 F.2d 1417 (9th Cir. 1990).

[4] During the negotiations with Arnold, attorneys for Pillsbury sent Russell L. Hewit (Mr. Hewit), attorney for Arnold, Martin, and MIC, a copy of applicable sections of two treatises on franchising, Rosenfield, The Law of Franchising, and Brown, Franchising Realities and Remedies (1982 rev.), in support of its contention that MIC, SIC, Arnold, and Martin had no enforceable rights to distribute Häagen-Dazs ice cream products that could not be terminated at will.

to Arnold, had value for which it was willing to pay. At the same time, Häagen-Dazs wished to terminate any residual rights to distribute Häagen-Dazs ice cream that its distributors might have acquired over the years, even as it maintained that neither Arnold nor MIC, or later, SIC, had any enforceable "distribution rights" as such. Häagen-Dazs was not interested in acquiring MIC as an ongoing distributor to either the supermarkets or the small grocery stores and food service accounts or in acquiring its physical assets.

During the early to mid-1980's, Arnold and Martin had increasingly vocal disagreements over the future direction of MIC. Arnold wished to expand the supermarket business, and Martin wished to expand the small store business. They were unable to agree on which course to take or otherwise to agree on coordinating their different business objectives.

Martin was concerned about MIC's overdependence on a small number of large supermarket accounts. He felt that a diversified customer base of small independent stores with higher gross profits carried less risk. Martin was concerned about the smaller profit margins of the supermarket business and also felt that the small stores had a better record of paying MIC's invoices in full and on time.

Arnold attributed Martin's disparagement of the supermarket business to his dislike of the process of developing and maintaining the personal relationships with the managers and

owners of the supermarkets that was needed to maintain access to supermarket freezer space.  Arnold believed that the small volume of sales generated by each of the independent stores did not justify the effort to acquire and service their accounts.

Arnold and Martin each blamed the other's approach to management of his own line of the business for MIC's not being more profitable during the mid-1980's.

From 1985 through 1988, Arnold's and Martin's disagreements intensified, especially in the aftermath of Arnold's promotion of MIC's failed investment in a warehouse facility in central Newark that would have substantially expanded MIC's capability to distribute ice cream to the supermarkets, just as Häagen-Dazs was building its own large distribution facility in the Bronx.  MIC's share of the total cost of the Newark facility would have been about $2.5 million.  In 1987 or early 1988, Arnold and Martin ultimately abandoned the project after MIC had invested approximately $100,000.

By 1988, Martin no longer wanted to work with Arnold, and Arnold felt that Martin was pushing him to retire.  They were looking for a way to end their constant strife over the future direction of petitioner.  Their disagreement had made them both receptive to the first overture from Häagen-Dazs in May 1986.  At that time, Arnold and Martin began consulting with their attorney, Russell L. Hewit (Mr. Hewit), concerning the

negotiations with Häagen-Dazs.[5]  Arnold was the primary negotiator in the talks with Häagen-Dazs.  To that end, Arnold executed a series of confidentiality agreements.  In March 1987, the initial talks broke down because the parties could not agree on the price for the business with the supermarkets.

To memorialize the termination of discussions, Mr. Hewit sent Häagen-Dazs a letter dated April 7, 1987, stating that he understood Häagen-Dazs to have made an initial offer of $3 million for "the Haagen-Dazs portion of the business".  In a letter dated April 16, 1987, Häagen-Dazs replied that it had not offered $3 million, and that the distribution rights under discussion were worth approximately $1 million.  Despite the breakdown in formal negotiations, the parties remained in contact.  On January 8, 1988, Arnold signed a new confidentiality agreement.

On May 4, 1988, the MIC board of directors, consisting of Martin, Arnold, and Mr. Hewit, and Arnold and Martin as MIC's shareholders, adopted and approved resolutions to form a subsidiary of MIC, to be called SIC.  Later that month, negotiations resumed between Häagen-Dazs and Arnold and Martin regarding the possible sale of Arnold's supermarket distribution rights.

---

[5] There is no evidence in the record that it ever occurred to Mr. Hewit, Martin, or Arnold that Martin and MIC should obtain separate legal representation, independent from Arnold, in negotiating and effectuating the split-off and the transactions with Häagen-Dazs.

As with the earlier negotiations, Arnold took the lead in the negotiations with Häagen-Dazs. Between May 13 and May 23, 1988, Arnold and Martin met at least three times with Häagen-Dazs representatives. On May 16, 1988, Hewit wrote a letter to Charles McGill, vice president--acquisitions, for Pillsbury, stating that, on May 13, proposals for Häagen-Dazs to buy MIC's "supermarket and food service business only" for up to $2.5 million had been rejected and that one of the obstacles was the possible sale of the remaining business to another distributor acceptable to Häagen-Dazs. However, neither Martin nor MIC thereafter pursued the possibility of such a sale, and the subject was never raised in subsequent negotiations with Häagen-Dazs.

On May 19, 1988, the parties discussed the outlines of an agreement to sell the supermarket and food service distribution business to Häagen-Dazs. On May 23, 1988, Mr. Hewit wrote another letter to Mr. McGill detailing the terms discussed in the meetings, including an overall price of $1.5 million for that business, $350,000 in additional contingent payments payable over 3 years, and annual payments of $150,000 to Arnold for 3 years, and of $50,000 to Martin for 5 years in return for consulting services and covenants not to compete in the retail super-premium ice cream distribution business, except as MIC and Martin would continue to distribute ice cream to stores other than the supermarket chains. Mr. Hewit's letter did not refer to any

allocation of the total price between distribution rights as such and the business records related to those rights, or even refer to any such records. Häagen-Dazs had derived the total price it was willing to pay from a formula based upon MIC's annual sales of Häagen-Dazs products to the supermarkets.

On May 31, 1988, SIC's certificate of incorporation was filed with the New Jersey secretary of state, and SIC was organized as a wholly owned subsidiary of MIC. On June 2, 1988, Stan Oleson of Pillsbury sent Mr. Hewit a draft "Agreement for Purchase and Sale of Assets" and other associated draft documents. The Agreement documents listed Arnold, Martin, MIC, and SIC collectively as "Sellers" and provided for the purchase of any and all of Sellers' distribution rights, "including but not limited to supermarket and food service distribution rights, if any" and their cancellation by the "Buyer". On June 6, 1988, Mr. Hewit replied to Mr. Oleson with a letter containing a number of modifications to the proposed agreements, chief among which was elimination of all references to Martin and MIC as parties to the proposed sale so as not "to increase the risk that the 355 Exchange will be collapsed". During the negotiations that culminated in the signing on July 8 of a sale agreement between Arnold and SIC as sellers and Häagen-Dazs as buyer, Mr. Hewit did not draft his own version of the sale agreement; he made mark-ups of his suggested changes and sent copies of the marked-up drafts back to Häagen-Dazs.

On June 14, 1988, Beth L. Bronner, vice president for strategic and business development for Häagen-Dazs, replied to Mr. Hewit's letter of June 6, stating that Häagen-Dazs had "incorporated, where possible, the suggested changes in your redraft and letter of June 6. However, many of the points in your letter reflected a transaction materially different from the one we believed we had negotiated with your clients". Ms. Bronner's letter stated that Häagen-Dazs had incorporated "your proposed exclusion of Martin Strassberg and * * * [MIC] from the Purchase Agreement," although it created "an important issue with which we must deal" in light of Häagen-Dazs' main objective of obtaining "any and all distribution rights" of both Arnold and Martin and their respective companies. Ms. Bronner proposed to resolve this issue through a separate "side agreement" in which Martin and MIC "would clearly acknowledge" that all rights to distribute "Häagen-Dazs products have been transferred to * * * [SIC] and that he * * * [Martin] claims no rights to distribute Häagen-Dazs."[6]

---

[6] The record includes an "Agreement", signed by Martin and Ms. Bronner on behalf of MIC and Häagen-Dazs, respectively, on July 8, 1988, that appears to be the contemplated "side agreement" referred to by Ms. Bronner in her June 14 letter. This agreement states that Häagen-Dazs and MIC would enter into three distribution agreements upon the closing of the Häagen-Dazs agreement with Arnold and SIC. The three distribution agreements, which were signed July 22, 1988, provide MIC with various rights to distribute certain Häagen-Dazs ice cream products in specified convenience stores, delis, places where ice cream is consumed on the premises, and other small independent grocery stores in New Jersey and parts of New York.

Mr. Hewit sought advice from two tax attorneys, Charles E. Falk, an attorney-C.P.A. with an LL.M. in taxation from New York University School of Law, and Martin's brother-in-law, Jan Neiman, an attorney practicing tax law in Miami Beach, Florida, on the tax structuring of the transactions creating SIC and distributing its stock to Arnold.[7]  Mr. Hewit sought their advice to ensure that he properly drafted all documents necessary to effect the separation of Martin and MIC from Arnold and SIC. There is no evidence in the record that Mr. Hewit considered trying to obtain a private letter ruling from the Internal Revenue Service, or that he rendered a written opinion to petitioner or Martin or Arnold regarding the tax consequences of the transactions at issue, or that Mr. Hewit or any of the parties in interest received a written tax opinion from Mr. Neiman or Mr. Falk.

On June 15, 1988, Arnold, Martin, and Mr. Hewit executed documents providing for the transfer of MIC's interests in the supermarket business and associated customer and pricing lists from MIC to SIC and the exchange of Arnold's stock in MIC for the stock of SIC (the split-off).  The first of these documents, entitled "Agreement", provided for the transfer of

---

[7] Martin also consulted with Mr. Neiman, who told him that "this is the way you should do it", referring to a distribution of stock under sec. 355 as a means of dissociating Arnold from MIC.  It is unclear from the record whether Mr. Falk and Mr. Neiman were aware of the ongoing negotiations with Häagen-Dazs.

All of the Corporation's [MIC's] rights to distribute Haagen-Dazs Ice Cream products to supermarket chains (Pathmark, Shop Rite, Foodtown and Acme) and food service accounts (restaurants, hotels and clubs), and the business records of said distributorship, including but not limited to customer lists and pricing lists, to the Subsidiary * * * for the purpose of transferring to Arnold all of the outstanding shares of the Subsidiary in exchange for the surrender by Arnold of all of his shares of the Corporation, in a transaction intended to qualify as a tax-free split-off under Internal Revenue Code Section 355, as amended * * *

A second document, dated June 15, 1988, also entitled "Agreement", stated that Martin and Arnold were operating separate businesses that were formerly jointly operated by MIC, and that both Arnold and Martin "wish to assure a smooth transition so that neither party loses customers or employees as a result of * * * misunderstanding".  The document further stated that

Following the Exchange, * * * [MIC] shall cooperate with * * * [SIC] and provide such assistance that is reasonably necessary for * * * [SIC] to conduct its business, provided that the rendering of such services does not unduly interfere with the conduct of * * * [MIC]'s business.

*       *       *       *       *       *       *

[SIC] shall pay to and reimburse * * * [MIC] for all costs incurred by * * * [MIC] in providing such services.

This agreement provided, among other things, that MIC would continue to deliver ice cream from its warehouse to SIC's supermarket accounts after the June 15 transactions separating MIC and SIC.  MIC did continue to do so until the closing of Arnold's and SIC's sale of assets to Häagen-Dazs on July 22.

On June 15, 1988, the MIC board of directors, consisting of Arnold, Martin, and Mr. Hewit, adopted a resolution, which was approved by Arnold and Martin as shareholders, declaring that MIC was in two separate businesses of equal fair market value, one distributing ice cream to supermarket chains and food service accounts and another distributing ice cream to small independent grocery stores. The resolutions stated that MIC undertook the transaction to split into two corporations in order to resolve the dispute between Arnold and Martin over the future direction of MIC and whether it would focus on distribution to supermarkets or to food service accounts and small stores and that Martin wished to operate the business of distribution of Häagen-Dazs ice cream products to nonsupermarket stores. Martin and Arnold each submitted his written resignation as a director, officer, and employee of the other company, Martin from SIC, and Arnold from MIC. Each of these documents bore the typed date "June 3, 1988", which was crossed out and amended by hand to read "June 15, 1988". None of the resolutions, agreements, or resignations contain any guaranty or indemnification from SIC or Arnold that would protect MIC or Martin from any tax liabilities arising from the split-off or the contemplated sale to Häagen-Dazs.

On June 20, 1988, Arnold and Mr. Hewit signed a directors' resolution of SIC, submitting to Arnold, as sole shareholder of SIC, an offer by Häagen-Dazs to "purchase all of the rights of the Corporation [SIC] to distribute Haagen-Dazs ice cream

products". Arnold then signed a shareholder's resolution to authorize SIC to enter into negotiations with Häagen-Dazs. In an undated memorandum, Arnold disclosed his customer list to Häagen-Dazs, most likely in response to a June 30 letter from Ms. Bronner.

In a letter to Mr. Hewit, dated July 1, 1988, Richard Wegener, a Pillsbury attorney, summarized changes made "to the various distributor agreements" pursuant to negotiations that had taken place the previous week. Mr. Wegener stated that, in the wake of those negotiations, Häagen-Dazs "clearly * * * [had its] work cut out concerning the financial issues raised by Section 4.5 of the proposed agreement." Mr. Wegener exhorted Arnold "to get out * * * on the table" all relevant information required to complete that section, which was a warranty and representation by Arnold and SIC concerning sales of Häagen-Dazs ice cream products to supermarkets by MIC and SIC for the period of June 1, 1987, to May 31, 1988. On July 5, 1988, Mr. Hewit sent Ms. Bronner documentation of the sales to supermarkets for the 12-month period ending May 31, 1988. On July 7, 1988, Mr. Oleson wrote Mr. Hewit a letter asking whether Häagen-Dazs' refusal to agree to deposit money in escrow on signing the purchase agreement would be a "deal breaker" that would require cancellation of this planned July 8 meeting to sign the agreeement. He also expressed optimism that the deal would be signed.

On July 8, 1988, Arnold, individually, and as president of

SIC, and Ms. Bronner, on behalf of Häagen-Dazs, signed an "Agreement For Purchase and Sale of Assets" by Arnold and SIC, as "Sellers", in which the parties agreed to the terms of the sale and related documents. Notwithstanding that the documents effectuating the split-off provided only for the transfer of supermarket and food service distribution rights and records to SIC, the Arnold-SIC-Häagen-Dazs agreement recited that SIC "owns all of the rights to distribute Häagen-Dazs product which were or may have been owned by Martin Strassberg and [MIC]," and purported to provide, consistent with the Häagen-Dazs first draft, for the purchase of all distribution rights including but not limited to supermarket rights.[8] This agreement specifically stated that "Buyer is not purchasing assets relating to the 'non-banner' business of * * * [MIC], the former parent of [SIC],"[9]

---

[8] The Agreement enumerated the "Sellers' Rights" as

Any and all of Seller's rights and the rights of any corporations or entities owned or controlled by Sellers obtained from Buyer, its predecessors, its customers or others to distribute the products of Buyer within the states of New York, New Jersey, Pennsylvania, Massachusetts, Delaware, Connecticut and elsewhere including but not limited to supermarket and food service distribution rights, if any (the "Sellers' Rights") * * *. Upon Closing of the transactions contemplated herein, any and all of such Sellers' Rights obtained by Sellers from Buyer or its predecessors shall be cancelled.

[9] "Non-banner" business was defined by the Agreement as "independent convenience stores and delis that have no more than two cash registers * * * `independent' shall mean a firm which

(continued...)

and allocated the stated $1.5 million price to be paid at the closing, $300,000 to "Records" and $1,200,000 to "Sellers' Rights".  There is no evidence in the record of any negotiation over this allocation or of any of the considerations that led Häagen-Dazs to allocate the purchase price in this fashion.

Unlike prior drafts of the purchase agreement in the record, the agreement as executed on July 8, 1988, between Häagen-Dazs and SIC and Arnold contains an Article 2.4 that makes the closing contingent on an audit by a "`Big-8' auditing firm" of the documentation of the sales to supermarket chains, independent supermarkets, and food service accounts for the 12-month period ending May 31, 1988.  The audit was required to ascertain the actual sales figures in order to set the purchase price under Article 2.4 in accordance with a purchase price reduction clause that applied to both the payment to be made at the closing and the contingent annual payments to be made over the following 3 years.[10]  Article 2.4 also provided that Häagen-Dazs would have

---

[9](...continued)
operates from one to ten stores".

[10] The Agreement provided that if the audited supermarket sales were greater than $4 million but less than $4,700,000, then there would be a downward adjustment to the purchase price equal to:

[1 - (audited sales figures/$4,700,000)] x $2,350,000.

The Agreement allocated 81 percent of the downward adjustment to the purchase price to be paid at closing and 19 percent to the
(continued...)

no obligation to close if the audited sales were less than $4 million for the period under audit.

On July 20, 1988, Touche Ross & Co. submitted an audit report to Häagen-Dazs, stating that the audited sales were less than represented by Arnold and SIC. As late as July 21, Mr. Hewit was still negotiating with Häagen-Dazs on behalf of petitioner concerning the list of accounts that MIC would continue to service after the sale.

On July 22, 1988, Arnold and representatives of Häagen-Dazs closed the sale to Häagen-Dazs. The employees of MIC who had reported to Arnold before June 15 continued to do so until that date. Arnold thereupon notified MIC in writing that SIC no longer required the services of MIC in delivering ice cream products to the supermarkets or in otherwise servicing their accounts.[11] SIC then paid MIC for services rendered. MIC's customers had not been notified of any changes in its business until they were notified of the sale of the supermarket distribution business to Häagen-Dazs.

The closing documents contained an amendment to the purchase agreement--signed July 22 after receipt of the Touche Ross & Co.

---

[10](...continued)
contingent annual payments payable to Arnold over the following 3 years.

[11] Martin testified that MIC and SIC delayed changing how product was delivered to the supermarket customers in order to get through the busy summer season.

audit of the supermarket sales figures--stating that during the 12-month period ending May 31, 1988, the sales of Häagen-Dazs products to the four supermarket chains, food service accounts, and independent supermarkets had totaled $4,528,000. Pursuant to the purchase price reduction clause of the Agreement, that sales figure resulted in a downward price adjustment of $86,000, of which $69,660 reduced the purchase price paid by Häagen-Dazs at the closing, and $16,340 of which reduced the amount of contingent additional payments payable to Arnold over 3 years. Consequently, the first closing document, entitled "Closing Statement", reduced the agreed sale price of $1.5 million to $1,430,340, and reduced the maximum amount of contingent annual payments of $350,000 to $333,660.

The bill of sale, signed by Arnold individually and as president of SIC, listed the items acquired from SIC as all existing customer lists, price lists, historical sales records, promotional allowance and rebate records, "and other business records as requested by Buyer, and the goodwill associated therewith".

Arnold also signed an "Assignment of Rights", which referenced--and transferred to Häagen-Dazs--the rights described supra, in two capacities: first, as president of SIC, and second, as an individual; there was no allocation of the

consideration paid for the rights as between Arnold and SIC.[12]
Ms. Bronner also signed the Assignment of Rights on behalf of
Häagen-Dazs.  Arnold signed a "Consulting and Non-Competition
Agreement" with Häagen-Dazs, for which he was to be paid $150,000
annually for a period of 3 years.  Martin also signed a
"Consulting and Non-Competition Agreement" with Häagen-Dazs, for
which he was to be paid $50,000 annually for a period of 5 years.
Finally, Häagen-Dazs entered into three nonexclusive distribution
agreements with petitioner for its continued distribution of
Häagen-Dazs ice cream products to specified small independent
stores and food service accounts in a limited geographical area.

On March 3, 1989, petitioner filed a Form 1120S for 1988,
reporting gross sales of $6,021,394 and an ordinary loss of $278.
Rudolph Bergwerk signed the return as preparer.  MIC's 1988 Form
1120S contained no reference to the creation of SIC, the transfer
to it of assets, or their basis, or the distribution of SIC stock
to Arnold in redemption of his stock in MIC.  Nor did the return
refer to SIC's and Arnold's subsequent sale of assets to Häagen-

---

[12] Subsequent to trial, respondent submitted to the Court a
facsimile of the face of a Häagen-Dazs check to SIC in the amount
of $1,430,340, accompanied by an affidavit that Häagen-Dazs
issued the check to SIC as payment due at the closing of the sale
of assets purportedly sold by SIC to Häagen-Dazs.  We do not
admit the facsimile and affidavit into evidence; there is
sufficient evidence in the record to support a finding that SIC
received the entire payment from Häagen-Dazs.  However, because
we decide this case as we do, initial receipt of payment by SIC
instead of Arnold does not determine the Federal tax treatment to
petitioner of the transactions at issue.

Dazs, contain any of the other information required by the regulations under sections 351, 355, or 368, or allocate earnings and profits between petitioner and SIC as required by section 312(h) and associated regulations with respect to a transaction governed by sections 355 and 368(a)(1)(D).

On April 10, 1989, SIC filed Form 1120S for its tax year 1988, which included a statement disclosing the sale of assets by SIC, including records and goodwill for $286,068 and the "right to distribute the product of buyer for $1,144,272".[13]  The statement also disclosed that Arnold, as sole stockholder distributee, would report the gain on his personal income tax return for taxable year 1988.  On July 14, 1989, Arnold caused SIC to be dissolved under New Jersey law.

For each tax year thereafter through 1995, MIC reported the following losses and gross sales as compared with 1988 and earlier years:

---

[13] This statement attached to the SIC Form 1120S indicates that the downward adjustment of $69,660 to the purchase price paid by Häagen-Dazs at closing was allocated between the distribution rights and business records of SIC in the same proportions as the relative amounts of the preadjustment allocation of the purchase price to be paid at the closing--80 percent, or $55,728, to the distribution rights, and 20 percent, or $13,932, to the business records.  The closing documents do not set forth or otherwise contain any reference to the allocation between distribution rights and business records of the reduction in the price paid at closing.

| Year | Gross Sales | Taxable Income | Retained Earnings |
|------|-------------|----------------|-------------------|
| 1986[1] | $8,488,491 | $68,728 | $551,383 |
| 1987[2] | 1,137,298 | 284 | 551,676 |
| 1988[3] | 6,021,394 | (278) | 551,398 |
| 1989 | 4,718,087 | (316,793) | 238,541 |
| 1990 | 5,532,675 | (58,153) | 180,388 |
| 1991 | 5,882,632 | (122,534) | 59,654 |
| 1992 | 5,518,248 | (75,726) | (16,072) |
| 1993 | 6,032,463 | (69,622) | (85,694) |
| 1994 | 5,619,756 | (201,778) | (287,472) |
| 1995 | 5,472,912 | (49,396) | (336,868) |

[1] Tax year Nov. 1, 1986-Oct. 31, 1987.

[2] Tax year Nov. 1, 1987-Dec. 31, 1987.

[3] Supermarket distribution rights and records sold to Häagen-Dazs July 22, 1988.

## ULTIMATE FINDINGS OF FACT

1.  The intangible assets embodied in Arnold's oral agreement with Mr. Mattus and personal relationships with the supermarket owners and managers were never corporate assets of petitioner.  Until the sale to Häagen-Dazs on July 22, 1988, Arnold was the sole owner of those assets, whose use he had hitherto made available to petitioner.  Accordingly, neither any transfer of rights in those assets to SIC nor their sale or other disposition to Häagen-Dazs is attributed to petitioner.

2.  The fair market value of the SIC stock distributed by petitioner to Arnold in redemption of his stock in petitioner was $141,000.

3.  Immediately after the distribution of the stock of SIC

to Arnold, and thereafter, SIC did not engage in the active conduct of a trade or business.

OPINION

1. Assets Transferred by MIC

Respondent advances two alternative grounds in support of the original determination that the $1,430,340 consideration received by Arnold and SIC measures the gain realized and recognized by petitioner: First, Arnold negotiated the sale of assets on behalf of MIC, and MIC should therefore be regarded as the true seller of the assets under the principle of Commissioner v. Court Holding Co., 324 U.S. 331 (1945); alternatively, the amount paid by Häagen-Dazs to SIC and Arnold measures the gain realized and recognized by petitioner on the redemption of Arnold's stock in petitioner, a split-off that fails to qualify for nonrecognition of corporate gain under section 355.

We disagree with respondent's overall position, insofar as it is predicated on the assumption or conclusion that petitioner owned assets with a value of $1,430,340 that were sold to Häagen-Dazs. Petitioner never owned all the assets sold to Häagen-Dazs. The record shows, and we have found as facts, that Arnold, acting on his own behalf and as agent for SIC, of which he was the sole shareholder, entered into a contract to sell Häagen-Dazs two distinctly different types of assets: The first, and much more valuable, was the intangible assets of Arnold's rights under his oral agreement with Mr. Mattus and his relationships with the

owners and managers of the supermarkets, which formed the basis of his ability to direct the wholesale distribution of super-premium ice cream to the supermarkets; the second, and much less valuable, was the business records that had been created by petitioner during Arnold's development of the supermarket business, and transferred by petitioner to SIC.

Arnold built the business of wholesale distribution of super-premium ice cream to supermarkets on the twin foundations of his personal relationships with the supermarket owners, the development of which preceded the creation of petitioner by some years, and his personal, handshake understanding with Mr. Mattus, which continued with Häagen-Dazs after its sale to Pillsbury. In developing his supermarket distribution business, Arnold changed the way ice cream was marketed to customers in supermarkets. The success of the venture depended entirely upon Arnold. Mr. Mattus' offer to go into business with Arnold distributing Häagen-Dazs ice cream products on the West Coast attests to the value that Mr. Mattus, Häagen-Dazs, and later, Pillsbury, placed on Arnold's position in the market, which retained considerable value as late as June 1988, when petitioner distributed the SIC stock to Arnold in redemption of his stock in petitioner.

Ownership of these intangible assets cannot be attributed to petitioner because Arnold never entered into a covenant not to compete with petitioner or any other agreement--not even an

employment agreement--by which any of Arnold's distribution agreements with Mr. Mattus, Arnold's relationships with the supermarkets, and Arnold's ice cream distribution expertise became the property of petitioner. This Court has long recognized that personal relationships of a shareholder-employee are not corporate assets when the employee has no employment contract with the corporation. Those personal assets are entirely distinct from the intangible corporate asset of corporate goodwill. See, e.g., Estate of Taracido v. Commissioner, 72 T.C. 1014, 1023 (1979) (where sole shareholder was sine qua non of corporation's success, corporation's goodwill did not include the personal qualities of its sole shareholder); Cullen v. Commissioner, 14 T.C. 368, 372 (1950) (personal ability, personality, and reputation of sole active shareholder not a corporate intangible asset where there is no contractual obligation to continue shareholder's services); MacDonald v. Commissioner, 3 T.C. 720, 727 (1944) ("We find no authority which holds that an individual's personal ability is part of the assets of a corporation by which he is employed where * * * the corporation does not have a right by contract or otherwise to the future services of that individual."); Providence Mill Supply Co. v. Commissioner, 2 B.T.A. 791, 793 (1925).

In the case at hand, as in MacDonald v. Commissioner, supra, petitioner never obtained exclusive rights to either Arnold's future services or a continuing call on the business generated by Arnold's personal relationships with the supermarket owners and

the rights under his agreement with Mr. Mattus; petitioner never had an agreement with Arnold that would have caused those relationships and rights to become petitioner's property. Even if there had been such an agreement, and the record shows that there was none, the value of these relationships and rights would not have become petitioner's property in toto. In 1974, Mr. Mattus sought Arnold as his agent to create a substantial presence for Häagen-Dazs ice cream in supermarkets after Mr. Mattus had been able to achieve only minimal market penetration through his own efforts. Mr. Mattus wanted what Arnold had already created in the 1960's when he operated Arnold's Ice Cream--the critical relationships with key supermarket owners and managers and the marketing know-how necessary to put ice cream products in supermarket freezers. See, e.g., Coskey's Television & Radio Sales & Serv., Inc. v. Foti, 602 A.2d 789, 795 (N.J. Super. Ct. App. Div. 1992) ("What * * * [the employee] brought to his employer, he should be able to take away."). The record shows that, at most, petitioner had only the benefit of the use of these assets while Arnold was associated with petitioner-- which contributed heavily to the profitability of petitioner during the years before the split-off.

Our conclusion that the rights under the oral agreement with Mr. Mattus, the personal relationships with supermarket owners and managers and the ice cream distribution expertise, belonged to Arnold rather than petitioner is confirmed by the disparity

between the sales price paid by Häagen-Dazs to Arnold and SIC and the value of petitioner as an ongoing business just before the split-off.  The sales figures from petitioner's tax returns show that the supermarket business generated slightly more than one-half of the pre-split-off sales.  Were petitioner to have been the owner of the rights sold to Häagen-Dazs, then the $1,430,340 paid to Arnold and SIC would have been approximately half the value of petitioner, and petitioner would presumably have had an overall fair market value approaching $3 million, a conclusion that would logically follow from respondent's arguments.  For reasons discussed infra, $3 million far exceeds any possible fair market value that petitioner, as a corporation with less than $8.5 million in gross sales and $70,000 net income in its best year, fiscal 1987, might have had immediately before the transactions in issue.

Our conclusion is not impaired by the fact that the corporate documents created by Mr. Hewit to accomplish the transfer of some of petitioner's assets to SIC and the distribution of SIC stock to Arnold purported to transfer supermarket distribution rights owned by petitioner.[14]  We have

_____

[14] We note that the record contains no documents that actually transfer assets from MIC to SIC in exchange for SIC stock.  The record contains only the MIC corporate resolutions stating the intention to make such transfer.  However, we are satisfied by those corporate resolutions and testimony by Arnold, Martin, and Mr. Hewit that such a transfer did occur, in the sense that petitioner transferred to SIC the records of the
(continued...)

already found that petitioner never owned the rights under Arnold's oral agreement with Mr. Mattus, nor his personal relationships with the supermarkets or his ice cream distribution expertise; petitioner merely had the benefits of the use of those assets during the years up to the split-off. What petitioner did not own, petitioner could not transfer; these documents transferred only that which belonged to MIC--the business records generated by the supermarket business that were subsequently transferred by petitioner to SIC in exchange for its stock.[15] Accordingly, we find that the sale to Häagen-Dazs of Arnold's supermarket relationships and distribution rights cannot be attributed to petitioner. All that is at stake in this case is the value of Arnold's remaining stock interest in petitioner, shorn of his supermarket relationships and distribution rights under his agreement with Mr. Mattus.

---

[14](...continued)
supermarket business and whatever rights petitioner had in that business.

[15] Petitioner may have had some residual rights to distribute Häagen-Dazs ice cream, but they were independent of Arnold's supermarket relationships and his value as a middleman. To the extent that they existed at all, they were in relationship to Häagen-Dazs' ability to terminate petitioner as a distributor. Häagen-Dazs was certainly interested in acquiring those rights as it rationalized and consolidated its wholesale distribution network as one of the assets it was buying from Arnold and SIC. However, in light of the summary judgment by the District Court, Northern District of California, in favor of Häagen-Dazs against a similarly situated distributor, the value of those rights in the event of termination by Häagen-Dazs was highly speculative at best.

2.  MIC Is Not the Deemed Seller of Assets to Häagen-Dazs Under Court Holding

Respondent argues that Arnold began and completed the negotiations with Häagen-Dazs for the sale of distribution rights on behalf of petitioner.  Respondent would have us believe that all essential terms fixed by the negotiations had been settled before Mr. Hewit informed Häagen-Dazs that SIC and Arnold would be the named sellers of the assets in the purchase agreement and instructed Häagen-Dazs to omit all references to Martin and petitioner from the purchase agreements.  Respondent urges the Court to apply the principle of Commissioner v. Court Holding, Co., 324 U.S. 331 (1945),[16] to find that petitioner is the true seller of the assets, and that SIC is a mere conduit whose

---

[16] Shortly after issuance of Rev. Rul. 96-30, 1996-1 C.B. 36, respondent first raised this theory with petitioner in a stipulation conference held on June 19, 1996, and was given leave to incorporate it in an amended answer filed less than 3 weeks before trial.  Generally, when the Commissioner makes allegations in an amended answer requiring the presentation of different evidence, then the Commissioner "has introduced a new matter" or a new issue that requires the shifting of the burden of proof to the Commissioner as to the new matter or issue.  Achiro v. Commissioner, 77 T.C. 881, 890 (1981); see also Seagate Tech. Inc. & Consol. Subs. v. Commissioner, 102 T.C. 149, 169 (1994).

Because the determination of the applicability of Commissioner v. Court Holding Co., 324 U.S. 331 (1945), required respondent to present evidence of the events leading up to the sale of assets which is different from the evidence showing that the requirements of sec. 355 were not met, we issued an order shifting the burden of proof to respondent on the Court Holding issue.  However, we decide the issue on a preponderance of the evidence; therefore, the allocation of the burden of proof does not determine the outcome.  See Kean v. Commissioner, 91 T.C. 575, 601 n.40 (1988) (citing Deskins v. Commissioner, 87 T.C. 305, 323 n.17 (1986)).

existence and participation in the sale to Häagen-Dazs should be ignored for Federal income tax purposes. Respondent's argument implies that petitioner constructively received the proceeds from the sale of assets to Häagen-Dazs, and then constructively distributed those proceeds to Arnold in redemption of his stock in petitioner.[17]

In Commissioner v. Court Holding Co., supra, a corporation with two shareholders, husband and wife, owned an apartment building as its only asset. Negotiating on behalf of the corporation, the husband entered into an oral agreement with the lessee that fixed all the terms and conditions for the sale of the apartment building and received a payment on account from the purchaser. After the negotiations had been completed, the husband was informed of the adverse tax consequences of a sale by the corporation. He thereupon caused shareholder resolutions to be adopted under which the corporation declared and distributed the apartment building to the shareholders as a "liquidating

---

[17] Implicit in respondent's Court Holding argument is the view that SIC's ownership of the assets transferred to it by MIC, and Arnold's ownership of SIC stock were too transitory to be recognized for tax purposes. However, we need not grapple with the transitory nature of SIC and the tax consequences of such a designation on the transactions in the case at hand. Respondent acknowledges that if we decide that Court Holding does not apply to attribute the sale to petitioner, then the transaction should be regarded as a sec. 351 transfer from MIC to SIC, followed by a taxable redemption of Arnold's shares in petitioner, thereby acknowledging the existence of SIC for Federal income tax purposes under respondent's alternative argument. See infra pp. 46-49.

dividend".  The shareholders then sold the apartment building on the same conditions and terms previously agreed upon to the same purchaser, and the prior payment received by the corporation was applied in part payment of the purchase price.  The Supreme Court affirmed the finding of the Tax Court that the transaction, in substance, was a sale by the corporation, and that the shareholders were mere conduits whose formal participation in the closing with the buyer was to be ignored for Federal income tax purposes.  The corporation was therefore liable for a corporate level tax on the gain recognized on the sale of the apartment building.

Any analysis of Court Holding would be incomplete without an examination of United States v. Cumberland Pub. Serv. Co., 338 U.S. 451, 455 (1950).  In Cumberland Pub. Serv., corporate assets were distributed in liquidation and thereafter sold by the corporation's shareholders.  Unlike Court Holding, the corporation at no time entered into negotiations to make the sale itself.  Instead the shareholders first offered to sell the buyer their stock; after the buyer rejected their offer, they conducted on their own behalf all the negotiations to sell the assets to the buyer.  The Supreme Court concluded that the shareholders were the sellers of the assets and refused to find that, in substance, the corporation was the actual seller.

Court Holding and Cumberland Pub. Serv. together support a narrow rule or holding on the genuineness of corporate

liquidations. In <u>Court Holding</u>, the Supreme Court upheld this Court's factual finding that the liquidation of the corporation was not genuine and never occurred for Federal income tax purposes. Therefore, the corporation continued to own the apartment building for tax purposes, and the shareholders were mere conduits used to pass title. In contrast, the Supreme Court in <u>Cumberland Pub. Serv.</u> upheld the factual finding of the Court of Claims that a genuine liquidation had occurred, and therefore the subsequent sale of assets by the shareholders was respected.

<u>Court Holding</u> and <u>Cumberland Pub. Serv.</u> also provide a broader principle that helps to explain why a corporate liquidation is respected in one setting and disregarded in another.[18] The substance of a transaction can be found in the negotiations leading up to the closing. Where the negotiations have culminated in an understanding that is inconsistent with the form of the final transaction, that form is said to be inconsistent with the substance, and the substance must prevail. Such is the case when a corporation negotiates all the terms and conditions of a sale of its assets, and then, at the last minute, distributes assets to its shareholders and the shareholders' names are conveniently inserted as sellers; the substance of the negotiations will prevail, and the corporation will be regarded as the seller for Federal income tax purposes.

---

[18] See Isenbergh, "Musings on Form and Substance in Taxation", 49 U. Chi. L. Rev. 859, 871-874 (1982), for a discussion of the narrow and broad interpretations.

This Court and others have acknowledged this broader principle of what Court Holding and Cumberland Pub. Serv. stand for.[19]  Where shareholders are found to have negotiated the sale of corporate assets independently, on their own behalf, the form of the transaction is respected, and the corporation is not recast as the seller, notwithstanding that some negotiations were carried on by the shareholders before the liquidation.  See, e.g., Bolker v. Commissioner, 81 T.C. 782 (1983), affd. 760 F.2d 1039 (9th Cir. 1985); Doyle Hosiery Corp. v. Commissioner, 17 T.C. 641 (1951); Amos L. Beaty & Co. v. Commissioner, 14 T.C. 52 (1950).[20]  Where a corporation is found to have negotiated a transaction, and at the last minute, the shareholders are substituted for the corporation as sellers, Court Holding has been applied to regard the corporation as the seller for Federal income tax purposes.  See, e.g., Waltham Netoco Theatres, Inc. v. Commissioner, 401 F.2d 333 (1st Cir. 1968), affg. 49 T.C. 399, 405 (1968); Kaufmann v. Commissioner, 175 F.2d 28 (3d Cir. 1949), affg. 11

_____

[19] The Supreme Court noted in Central Tablet Manufacturing Co. v. United States, 417 U.S. 673, 680 (1974), that its earlier decisions in Court Holding and United States v. Cumberland Pub. Serv. Co., 338 U.S. 451, 455 (1950), "created a situation where the tax consequences were dependent upon the resolution of often indistinct facts as to whether the negotiations leading to the sale had been conducted by the corporation or by the shareholders."  See also Bolker v. Commissioner, 81 T.C. 782, 799 (1983), affd. 760 F.2d 1039 (9th Cir. 1985).

[20] There is some discussion in the above-cited cases concerning whether shareholders who are corporate officers or directors can negotiate a sale of assets in corporate solution on their own behalf, rather than on the corporation's behalf, especially when the negotiations take place before the corporation resolves to liquidate the assets that are to be sold.

T.C. 483 (1948).[21]

Arnold, on behalf of himself as well as petitioner, began negotiations with Häagen-Dazs with respect to the sale of distribution rights in January 1988.  On May 4, 1988, MIC adopted corporate resolutions authorizing the creation of a wholly owned subsidiary to be called SIC.  Over the following weeks, Arnold, Mr. Hewit, and representatives of Häagen-Dazs continued to negotiate the price and terms of a sale of distribution rights by MIC to Häagen-Dazs.  On May 31, 1988, SIC was organized as a wholly owned subsidiary of MIC.  On June 6, 1988, in response to the Häagen-Dazs first draft of purchase agreement, which provided for the sale of all distribution rights, Mr. Hewit informed Häagen-Dazs that Martin and MIC would not be parties to the sale transaction.  In a letter sent to Mr. Hewit dated June 14,

---

[21] Although Commissioner v. Court Holding Co., supra, deals with corporations that distribute assets to their shareholders in complete liquidation, the Commissioner has recently applied its conduit theory to sec. 355 distributions.  In Rev. Rul. 96-30, 1996-1 C.B. 36, D, a publicly traded corporation, distributes the stock of C, its wholly owned subsidiary, to its shareholders in a spin-off.  C then enters into negotiations with Y, an unrelated corporation, and is merged into Y, after a vote to do so by C's shareholders, under a plan that meets all the requirements of sec. 368(a)(1)(A).  Rev. Rul. 96-30, supra, specifically cites the complete lack of negotiations regarding the acquisition of C by Y before the spin-off as the determining factor in respecting the form of the transactions under Commissioner v. Court Holding Co., supra, in addition to the shareholder vote cited in Rev. Rul. 75-406, 1975-2 C.B. 125.  Although respondent did not cite Rev. Rul. 96-30, supra, on brief, see supra note 16.

While Rev. Rul. 96-30, supra, indicates that a complete lack of negotiations before the spin-off will prevent the recasting of transactions under Court Holding, situations where there have been some, or even substantial, negotiations are not addressed. Nor does Rev. Rul. 96-30, supra, deal with a non pro rata distribution such as a split-off, as in the case at hand.

1988, Ms. Bronner stated that Häagen-Dazs, as requested by Mr. Hewit, would eliminate references to Martin and MIC from the purchase agreement, but she insisted that Häagen-Dazs had to acquire "any and all" of the distribution rights owned by Martin, Arnold, and their respective companies. On June 15, 1988, MIC executed documents providing for the transfer of supermarket chain and food service distribution rights, and business records related thereto, from MIC to SIC. Thereafter, Arnold continued to negotiate with Häagen-Dazs on behalf of himself and SIC until the purchase agreement was signed on July 8. The purchase agreement, as finally negotiated and amended at the closing on July 22, provided that Häagen-Dazs could walk away from the deal if an audit by a "Big-8" accounting firm disclosed ice cream sales by petitioner of less than $4 million for the 12-month period ended May 31, 1988, and for a reduction in both the fixed and deferred contingent portions of the purchase price if such sales amounted to less than $4.7 million. On July 22, following the Touche-Ross sales audit and the parties' agreement that ice cream sales amounted to $4,528,000, the sales price paid at the closing was reduced to $1,430,340 and the maximum deferred contingent payments were reduced to $333,660.

The facts of this case are distinguishable from those of Court Holding. In Court Holding and other cases applying its holding, such as Waltham Netoco Theaters, Inc. v. Commissioner, supra, the change in the identity of the sellers took place at the last minute. In such cases, the only difference in whether the corporation or all its shareholders are regarded as the seller(s) lies in whether the

proceeds of the sale to which the shareholders become entitled will be decreased by the amount of the corporate level tax imposed.  In the present case, the change in the identity of the sellers, namely the removal of Martin and MIC, resulted in a significant economic change that was independent of any change in tax consequences.  Once SIC, wholly owned by Arnold, was designated as the seller, along with Arnold, a situation was created in which all proceeds of the sale would come under the control of Arnold, to the exclusion of Martin and MIC.[22]

The change in the identity of the sellers was not a "last minute" change in a deal that had already been consummated, or whose terms had been completely negotiated.  Rather, it signaled the birth of a new deal significantly different from its predecessor, both in terms of what would be sold and who would receive the proceeds.  Stated differently, having Arnold and SIC, rather than petitioner, sell assets to Häagen-Dazs was not a mechanism to give effect to a transaction that had already been negotiated by, or on behalf of, petitioner.  See Kaufmann v. Commissioner, 11 T.C. at 490-491 (Kern,

---

[22] Compare the ownership position of the single shareholder, which remained unchanged, in Idol v. Commissioner, 38 T.C. 444 (1962), affd. 319 F.2d 647 (8th Cir. 1963), with Standard Linen Serv., Inc. v. Commissioner, 33 T.C. 1 (1959), and Esmark, Inc. & Affiliated Cos. v. Commissioner, 90 T.C. 171 (1988), affd. without published opinion 886 F.2d 1318 (7th Cir. 1989), where redemptions accomplished a substantial change in the ownership of the stock of the taxpayer corporation.  Similar to Standard Linen and Esmark, MIC's redemption of Arnold's stock substantially changed the proportionate ownership of MIC by eliminating one of the two shareholders and assured that Arnold would receive the entire consideration paid by Häagen-Dazs for acquisition of the distribution rights.

J., concurring).

Not only are the facts of this case distinguishable from those of Court Holding, but they also fall under the rubric of Cumberland Pub. Serv., where the taxpayer corporation did not negotiate a sale of assets. As in Cumberland Pub. Serv., we focus on the "negotiation substance" of the transaction to determine whether it is consistent with its form. This requires us to first identify the transaction, whose negotiations we examine. Where, as here, a change in the identity of a seller occurs during the negotiation process, and that change has business purposes and economic effects that are independent of any tax consequences, then the transaction is transformed and a new transaction arises. In then determining whether the form of the new transaction is consistent with its substance, the only negotiations that are relevant are those that occur after the identity of the seller has changed.

After SIC became a party to the sale transaction, replacing petitioner, the transaction was transformed. In determining whether the form of the transaction is consistent with its substance, we focus on the negotiations that occurred once SIC became the named seller in the proposed new transaction. Petitioner took no part in these subsequent negotiations for the sale of distribution rights, and therefore the final form of the transaction is consistent with its substance. We accordingly deny respondent's attempt to apply Court Holding to treat petitioner as a seller of assets to Häagen-Dazs.

3.  <u>Split-Off Did Not Qualify Under Section 355</u>

Section 355 generally allows a corporation to make a tax-free distribution of an amount of stock constituting control of a corporation (control being defined in section 355(a)(1)(D)(ii) for purposes of section 355 by reference to section 368(c))[23] to its shareholders, provided the active business requirement of section 355(b) is satisfied, and the transaction is not deemed a "device" to make a tax-free distribution of earnings and profits, which otherwise would be taxable as a dividend.  The section 355 regulations impose other requirements, which we need not address.

Respondent determined that petitioner failed to satisfy several of the requirements for nonrecognition of gain under section 355 when it distributed SIC stock to Arnold in redemption of Arnold's stock in petitioner.  We need consider only whether SIC was actively engaged in a trade or business immediately after the split-off within the meaning of section 355(a)(1)(C) and (b)(1)(A), which requires that the distributing corporation and the subsidiary corporation both be "engaged immediately after the distribution in the active conduct of a trade or business".  Sec. 355(b)(1)(A).

The determination of whether a trade or business is actively engaged in is a factual question requiring an examination of all the facts and circumstances.  Under section 1.355-(1)(c), Income Tax

---

[23] The corporation must also be in control of the corporation whose stock is being distributed immediately before the distribution.  Sec. 355(a).

Regs., a corporation is treated as engaged in a trade or business immediately after the distribution if it

> consists of a specific existing group of activities being carried on for the purpose of earning income or profit from only such group of activities, and the activities included in such group must include every operation which forms part of, or a step in, the process of earning income or profit from such group.  * * *

By requiring that a trade or business be actively conducted, section 355 envisions a corporation with substantial management and operational activities directly carried on by the corporation itself. See sec. 1.355-3(b)(2)(iii), Proposed Income Tax Regs., 42 Fed. Reg. 3870 (Jan. 21, 1977);[24] see also Rev. Rul. 73-236, 1973-1 C.B. 183.

Petitioner's distribution of SIC stock does not qualify for nonrecognition of gain under section 355(c) because SIC was not engaged in the active conduct of a trade or business immediately after the distribution.  SIC received no operating assets from petitioner on the transfer of intangible assets by petitioner to SIC in exchange for SIC stock.  During the 6-week period from the time of the split-off until the sale of all of the assets of SIC to Häagen-Dazs, SIC did not directly carry on any operational activities.  SIC had neither the assets nor the employees required to engage in the active conduct of an ice cream distributorship.

---

[24] The proposed regulations were finalized by T.D. 8238, 1989-1 C.B. 92.  The final regulations, however, are effective for transactions occurring after Feb. 6, 1989.  In response to several comments received by practitioners requesting guidance, the final regulations also state that in determining whether a corporation is actively conducting a trade or business, activities performed by independent contractors will generally not be taken into account.  See sec. 1.355-3(b)(2)(iii), Income Tax Regs.

SIC used petitioner's employees in all of its operational activities.  Petitioner was retained as an independent contractor by SIC.  Petitioner and Martin's agreement with SIC and Arnold stated that MIC would provide all services "reasonably necessary" for SIC to carry on during an interim period while it made alternative arrangements.  Pursuant to that agreement, drivers employed by MIC made all the deliveries to SIC's supermarket accounts during the interim 6-week period.  Other than perhaps Arnold, its sole shareholder, SIC had no employees.

SIC used petitioner's tangible assets in all of its operational activities.  After the distribution, petitioner continued to own all the refrigerated trucks and storage facilities required to operate both the small store and supermarket businesses.  During the period between the split-off and the sale to Häagen-Dazs, trucks owned by MIC made all the deliveries to the supermarkets, and the MIC warehouse and refrigeration facilities were used to store the Häagen-Dazs ice cream products until they could be delivered to the supermarkets.  The supermarket customers themselves were largely unaware until the closing of the transactions with Häagen-Dazs on July 22 that Martin and MIC had parted company from Arnold and SIC.

4.  <u>Petitioner's Gain Recognized on Distribution of SIC Stock</u>

Because petitioner's transfer of assets to SIC and distribution of SIC stock to Arnold do not qualify for nonrecognition of gain under section 355, we must determine the Federal income tax consequences of these transactions under other provisions of the Code.

Respondent acknowledges that petitioner was entitled to nonrecognition of gain under section 351 upon the transfer of assets to SIC in exchange for its stock[25] but argues that petitioner recognized gain under section 311(b) on the immediately following distribution of the SIC stock to Arnold in redemption of his stock in petitioner.  We agree with respondent.

a.  MIC's Transfer of Assets to SIC

Under section 351(a), a transfer of property to a corporation solely in exchange for its stock does not trigger a recognition event, provided that immediately after the transfer the transferor or transferors "are in control (as defined in section 368(c))" of the transferee.  Section 351(c) modifies the controlling interest requirement, providing that, in determining control for this purpose, the fact that a corporate transferor distributes to its shareholders all or part of the stock of the transferee "shall not be taken into account."

The June 15, 1988, transfer of assets by MIC to SIC, solely in exchange for the stock of SIC, is a nonrecognition event under section 351(a).  Immediately after the transfer, MIC received all the stock of SIC, which it thereupon distributed to one of its shareholders, Arnold.  By reason of section 351(c), the distribution of SIC stock to

---

[25] The record is not clear whether petitioner received the stock of SIC on May 31, 1988, the date of its incorporation, or June 15, 1988, the effective date of the transfer of assets from petitioner to SIC.  Because respondent acknowledges on brief that petitioner's basis in SIC stock is determined under secs. 351 and 358, we treat the operative events as having occurred simultaneously.

Arnold does not adversely affect the conclusion that MIC had a controlling interest in SIC immediately after the transfer.

In Rev. Rul. 68-298, 1968-1 C.B. 139, a corporation transferred property to a newly created subsidiary in exchange for all the stock of the subsidiary, whereupon the transferor distributed 25 percent of the transferee corporation's stock to a shareholder in complete redemption of the shareholder's stock in the transferor. The Commissioner ruled that the transferor had maintained its controlling interest under section 351(a) and (c), notwithstanding that the transferor's remaining interest in the transferee was less than 80-percent control as defined in section 368(c).

We agree with the conclusion of Rev. Rul. 68-298, supra, which is consistent with the statutory language of section 351. Section 351(c) provides that a transferor corporation's subsequent distribution of transferee stock to its shareholders "shall not be taken into account"; this means that the transferor will not be deemed to have relinquished control immediately after the transfer by reason of having distributed to one or more of its shareholders all or part of the stock of the transferee, even though the distribution effects a termination of the shareholder's interest in the transferor.

b.   Distribution of SIC Stock to Arnold in Redemption of His Stock in Petitioner

While the transfer of assets by MIC to SIC was a nonrecognition event for Federal income tax purposes, the subsequent distribution of SIC stock to Arnold by MIC was not. The rules of subchapter C determine whether and to what extent an S corporation recognizes gain

on the distribution of property in redemption of its stock.  S. Rept. 100-445, at 66 (1988); see also Eustice & Kuntz, Federal Income Taxation of S Corporations, par. 8.02[1][a], at 8-24, par. 13.06[2], at 13-40 (3d ed. 1993).

The distribution of SIC stock to Arnold in exchange for his stock in petitioner was a distribution of property under section 317(a), amounting to a redemption by petitioner of its stock held by Arnold.[26] Sec. 317(b).[27]  Section 311(a), as enacted by the 1954 Code, codified the rule of General Utils. & Operating Co. v. Helvering, 296 U.S. 200 (1935), by providing that a distributing corporation generally recognizes no gain or loss on distributions of property with respect to its stock.  However, section 631(c) of the Tax Reform Act of 1986 (TRA), Pub. L. 99-514, 100 Stat. 2272, amended section 311(b) so as to effectively repeal the rule of General Utilities where there is a gain on distributions of property with respect to stock.  Section 311(b) now provides that a corporation recognizes gain to the extent that the fair market value of the distributed property exceeds its adjusted basis in the hands of the distributing corporation.  Petitioner

_____

[26] Stock redemptions by S corporations are governed by the provisions of subch. C.  Sec. 1371(a)(1); S. Rept. 100-445, at 66 (1988); see also Eustice & Kuntz, Federal Income Taxation of S Corporations, par. 8.02[1][a], at 8-24, par. 13.06[2], at 13-40 (3d ed. 1993) .

[27] Sec. 317(b) provides:

For purposes of this part, stock shall be treated as redeemed by a corporation if the corporation acquires its stock from a shareholder in exchange for property, whether or not the stock so acquired is cancelled, retired, or held as treasury stock.

therefore recognized the gain that it realized on the distribution of SIC stock in redemption of Arnold's stock in petitioner, measured by the excess of fair market value over the basis of the SIC stock distributed.

Petitioner presented no evidence to establish the adjusted basis of assets transferred to SIC in the section 351 exchange. Inasmuch as petitioner has the burden of proof with respect to this issue and presented no evidence, we accept respondent's determination of the adjusted basis of the SIC stock, which is zero, the same as the adjusted basis of the assets that petitioner transferred to SIC in the section 351 exchange. Sec. 358(a)(1).

c.   Amount Realized on Distribution of SIC Stock

We next determine the fair market value of the appreciated property that petitioner distributed to Arnold--the SIC stock. To ascertain the fair market value of property, whether for income tax purposes or for estate tax purposes, Champion v. Commissioner, 303 F.2d 887, 892-893 (5th Cir. 1962), revg. and remanding on other grounds T.C. Memo. 1960-51, we must determine "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." United States v. Cartwright, 411 U.S. 546, 551 (1973); sec. 20.2031-1(b), Estate Tax Regs.  This determination presents a question of fact, Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982), based on all the evidence in the record, Helvering v. Safe Deposit & Trust Co., 316

U.S. 56, 66-67 (1942); Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285.

Our task is made all the more difficult by the lack of any direct evidence in the record of the market value of the SIC stock.  However, we may approximate the value of the SIC stock by determining the fair market value of Arnold's previously held stock in MIC, inasmuch as the taxable event at issue is the distribution by MIC of SIC stock in redemption of Arnold's stock in MIC.  See United States v. Davis, 370 U.S. 65, 72 (1962); Philadelphia Park Amusement Co. v. United States, 130 Ct. Cl. 166, 126 F. Supp. 184, 189 (1954); Spruance v. Commissioner, 60 T.C. 141, 157 (1973), affd. without published opinion 505 F.2d 731 (3d Cir. 1974); Williams v. Commissioner, T.C. Memo. 1997-326.

Respondent did not submit an expert's report valuing the SIC stock, arguing that this is not a valuation case.  In respondent's view, the intervening transfer of property by MIC to SIC and exchange of SIC stock for Arnold's MIC stock are to be disregarded, and petitioner held, under the Court Holding theory, to be the constructive seller of all property sold to Häagen-Dazs, having a fair market value of $1,430,340, as established by the price paid by Häagen-Dazs for assets purchased less than 6 weeks later.  Similarly, respondent argues, even if respondent loses on the Court Holding theory, that the price paid in the Häagen-Dazs sale is the best evidence of the value of the assets transferred from MIC to SIC and of the value of Arnold's MIC stock that was redeemed.  For reasons previously discussed, we have rejected respondent's overall position

equating petitioner's gain with the total amount of the consideration paid by Häagen-Dazs in the purchase and sale transaction.

Petitioner submitted an expert witness report that valued Arnold's share of MIC as an ongoing business prior to the June 15 transfer at $141,000. Rudolph Bergwerk, a certified public accountant, prepared the report for petitioner. Expert opinions can aid the Court in understanding an area of specialized training, knowledge, or judgment, such as valuation. Perdue v. Commissioner, T.C. Memo. 1991-478. While we may accept an expert's opinion in its entirety, Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), we are not bound to do so, Silverman v. Commissioner, supra, and may selectively use any portion of the report and testimony in determining fair market value of property, IT&S of Iowa, Inc. v. Commissioner, 97 T.C. 496, 508 (1991); Parker v. Commissioner, 86 T.C. 547, 562 (1986).

Respondent urges the Court to reject Mr. Bergwerk's report in its entirety on the ground that he was a "hired gun". Cf. Estate of Mueller v. Commissioner, T.C. Memo. 1992-284. Experts are not supposed to be "hired guns"; they lose their usefulness and credibility to the extent to which they become mere advocates for the side that hired them. Estate of Halas v. Commissioner, 94 T.C. 570, 577 (1990); Buffalo Tool & Die Manufacturing Co. v. Commissioner, supra at 452.

Mr. Bergwerk is a certified public accountant who had an ongoing professional relationship with petitioner as petitioner's tax return preparer from 1982 through 1985. Mr. Bergwerk prepared personal

income tax returns for Martin and Arnold during this same period.  He also represented petitioner before the IRS in the audit that preceded the issuance of the deficiency notice at issue in this case.  Respondent argues that these prior relationships so infect Mr. Bergwerk's report with bias that we should completely disregard it.  The mere existence of the relationships does not automatically disqualify Mr. Bergwerk as petitioner's expert.  See, e.g., Estate of Bennett v. Commissioner, T.C. Memo. 1993-34 (appraiser was a longtime family adviser and was a coexecutor of the estate).  Nor is Mr. Bergwerk automatically disqualified by his lack of formal qualifications as an appraiser.  Id. (citing Fed. R. Evid. 702; Grain Dealers Mut. Ins. Co. v. Farmers Union Coop. Elevator & Shipping Association, 377 F.2d 672, 679 (10th Cir. 1967)).

In Estate of Halas v. Commissioner, supra at 578, we stated that an "appraiser's duty closely corresponds to the public duty of an auditor or certified public accountant."  On the basis of the nature of the report, which we discuss infra, Mr. Bergwerk's professional qualifications as a certified public accountant, and the testimony of Mr. Bergwerk, we are satisfied that Mr. Bergwerk was not acting as a mere advocate for petitioner, but as an appraiser with a duty to the Court.  Id. at 577.  However, we do not ignore or disregard this prior and continuing relationship between Mr. Bergwerk and petitioner, Arnold, and Martin and weigh it in the balance of whether--and the degree to which--to accept Mr. Bergwerk's expert opinion.

Mr. Bergwerk stated that he had based his report on the methodology set forth in Rev. Rul. 59-60, 1959-1 C.B. 237, modified by

Rev. Rul. 65-193, 1965-2 C.B. 370, and Rev. Rul. 68-609, 1968-2 C.B. 327, and amplified by Rev. Rul. 77-287, 1977-2 C.B. 319, Rev. Rul. 80-213, 1980-2 C.B. 101, and Rev. Rul. 83-120, 1983-2 C.B. 170. We follow the principles set forth in Rev. Rul. 59-60, supra, which we recognize as having been "widely accepted as setting forth the appropriate criteria to consider in determining fair market value", Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990), to the extent they represent a correct approach to the valuation of closely held corporations, see Stark v. Commissioner, 86 T.C. 243, 250-251 (1986).

Mr. Bergwerk's report characterized petitioner as an undiversified company engaged in a single line of business, the wholesale distribution of ice cream products, which was highly dependent on weather and time of year. Petitioner also had "an unhealthy concentration" of its business in Häagen-Dazs products. Despite such drawbacks, the company had expanded its gross sales substantially in the 5 years before the distribution of SIC stock. Mr. Bergwerk opined that the potential for further growth was limited because of the ability of supermarkets and ice cream manufacturers to eliminate independent wholesale distributors from business.[28]

Mr. Bergwerk expressly considered each of the factors set forth in Rev. Rul. 59-60, 1959-1 C.B. at 238-239, as a basis for valuation of closely held corporations. In arriving at his valuation of MIC as

---

[28] The evidence in the record strongly supports Mr. Bergwerk's opinion concerning petitioner's market position and relative vulnerability to outside forces.

an ongoing business, Mr. Bergwerk assigned relative weights to the three valuation factors that he found persuasive--50 percent to capitalized earnings, 30 percent to petitioner's dividend-paying capacity, and 20 percent to petitioner's book value--and then averaged the factors in accordance with those relative weights. In so doing, he appropriately gave primary consideration to petitioner's earnings history, as recommended by Rev. Rul. 59-60, sec. 5, 1959-1 C.B. at 242, and estimated petitioner's fair market value as an ongoing business prior to the separation of the business lines to be $276,509, and Arnold's 51-percent share, which was redeemed upon distribution of SIC stock, to be $141,000.

Mr. Bergwerk used the same three factors and approach used in Bader v. United States, 172 F. Supp. 833 (S.D. Ill. 1959), a case decided prior to the issuance of Rev. Rul. 59-60, supra, which also averaged the results of the factors. Mr. Bergwerk did not discount his valuation on account of lack of marketability, as did the court in Bader, nor did he provide an explanation of why he used the particular weights he used, or of why he had disregarded the admonishment of Rev. Rul. 59-60, 1959-1 C.B. at 243, that "no useful purpose is served by taking an average of several factors * * * and basing the valuation on the result."

Despite the problems we have with Mr. Bergwerk's report, we find that Mr. Bergwerk's estimate of the fair market value of petitioner just prior to the transactions in issue provides a reasonable upper limit on the value of petitioner as of June 1988; we adopt Mr. Bergwerk's figure, in the absence of countervailing expert opinion and

testimony from respondent.

Of the three valuation factors used by Mr. Bergwerk, the highest amount was book value as of October 31, 1987, $552,061.[29]  In calculating the capitalized earnings of petitioner at $331,394, Mr. Bergwerk estimated the earning capacity of petitioner as $53,023 per year after taxes, based on a weighted average of the 5 years of operations ending on October 31, 1987,[30] and a price-earnings ratio of 6.25:1, the same as used by this Court in Estate of Little v. Commissioner, T.C. Memo. 1982-26, to determine the value of a closely held, diversified corporation engaged in light manufacturing.  Mr. Bergwerk discounted the price-earnings ratio because of the corporate shortcomings noted above, the dependence of the business on Arnold's personal relationships with the supermarkets, and the lack of a second tier of management.

Mr. Bergwerk opined that the corporation had no goodwill because the rate of return on tangible assets did not exceed 10 percent, a rate of return on tangible assets suggested by Rev. Rul. 68-609, 1968-2 C.B. 327.  Under the approach of Rev. Rul. 68-609, supra, any return in excess of 10 percent would be attributable to goodwill or other intangibles for tax purposes.  See also Financial Valuation: Businesses and Business Interests, par. 16.4[7], at 16-10 (Zukin ed.

---

[29] Mr. Bergwerk estimated the book value as $554,061 in the text of his report and $552,061 in the exhibit.  The exhibit corresponded to the book net worth shown in the tax balance sheet in petitioner's 1987 tax return.

[30] Petitioner's net income rose from $40,873, or 0.0081 percent of gross sales, in 1983, to $55,914, or 0.0066 percent of gross sales, in 1987.

1990).  However, petitioner did have some intangibles in the form of customer lists and pricing lists.  Petitioner transferred those business records pertaining to the supermarket distribution business to SIC in the initial tax-free exchange for SIC stock.  Petitioner retained other proprietary information pertaining to the independent grocery store business that Martin continued to conduct in the years subsequent to the transactions at issue.

Mr. Bergwerk determined that petitioner had no dividend-paying capacity, using the methodology that this Court used in <u>Bardahl Manufacturing Corp. v. Commissioner</u>, T.C. Memo. 1965-200, to determine reasonable business needs for retained earnings.  He therefore assigned a fair market value of zero to MIC as an ongoing business on the basis of this lack of dividend-paying capacity.  In so doing, Mr. Bergwerk disregarded an explicit instruction in Rev. Rul. 59-60, 1959-1 C.B. at 241, which points out that, where

> an actual or effective controlling interest in a corporation is to be valued, the dividend factor is not a material element, since the payment of such dividends is discretionary with the controlling stockholders.  The individual or group in control can substitute salaries and bonuses for dividends, thus reducing net income and understating the dividend-paying capacity of the company. It follows, therefore, that dividends are less reliable criteria of fair market value than other applicable factors.

Even though a valuation derived from dividend-paying capacity is an inappropriate factor in this case, the relative lack of dividend-paying capacity cannot be entirely ignored in that it shows the extent to which petitioner was undercapitalized in those years--a factor that

negatively affects petitioner's fair market value.[31]

Under the circumstances of this case, use of book value would tend to overvalue petitioner, especially in light of the effect of the relatively low--and dropping--ratio of net income to sales during the mid-1980's on the value of petitioner and the relative lack of dividend-paying capacity, which shows the precarious nature of petitioner's financial health. Capitalized earnings at a 6.25:1 price/earnings ratio, $331,394, also over- values petitioner to the extent that it does not sufficiently take into account a number of other factors not fully considered by Mr. Bergwerk.

Although Mr. Bergwerk discussed petitioner's overreliance on Häagen-Dazs as its major supplier, he did not expressly take into account the negative effect on marketability--and hence fair market value--of Häagen-Dazs' effective veto over any sale to an unrelated third party. Because of the tenuous nature of petitioner's distribution rights--if any--to Häagen-Dazs products, Häagen-Dazs could effectively stop a sale of petitioner, if it did not approve of the buyer, by threatening to stop supplying petitioner with its product. The withdrawal of Häagen-Dazs as a supplier would leave

---

[31] Using the formula used in Bardahl Manufacturing Corp. v. Commissioner, T.C. Memo. 1965-200, which calculates the amount available for dividends as the working capital at year's end less necessary working capital and capital expenditures actually made in the following year, petitioner was insufficiently capitalized in the years immediately preceding the separation of the business lines. Necessary working capital was determined as a function of working capital requirements for the year and the length of petitioner's operating cycle, which is determined by inventory and accounts receivable turnover and the credit period extended by suppliers--primarily Häagen-Dazs.

petitioner as little more than a collection of physical assets and a distribution network with nothing to distribute.  Häagen-Dazs' cold shoulder to Mr. Hewit's overture in his May 16, 1988, letter concerning the possible sale of the nonbanner business to an unrelated third party, and the abandonment of any further effort to sell by Martin, is probative, not only of the effect of Häagen-Dazs' veto on petitioner's marketability--and its market value--but also of the likelihood that Häagen-Dazs would have used such a veto.

Another factor having a depressing effect on fair market value is the lack of value that Häagen-Dazs attached to petitioner as an ongoing business concern.  This is demonstrated by the refusal of Häagen-Dazs to consider buying any of petitioner's assets beyond a few business records that documented the sales to the supermarkets. Despite petitioner's investment in refrigerated trucks and warehouse facilities during the mid-1980's--which contributed to the anemic position of its net current assets and its inability to pay dividends--Häagen-Dazs still considered petitioner's physical plant and equipment to be substandard for purposes of distributing Häagen-Dazs ice cream.

We must also consider the effect of petitioner's being a small, family-owned business on the sale by either Arnold or Martin of his interest in petitioner without the sale of the other interest.  While we do not assign a precise value to this discount factor, the closely held nature of petitioner and the reluctance of a third party to buy into a family-owned business, especially one with the handicaps we

have just recited, could serve only to decrease the market value of the interest for sale.

Also important is that the conditions under which petitioner had operated during the 1970's had changed in the 1980's, when Pillsbury acquired Häagen-Dazs, with the avowed goal of distributing ice cream to supermarkets itself rather than relying on independent distributors such as petitioner--a fact well known at the time of the redemption of Arnold's stock in MIC. These changed conditions render suspect any fair market value based on past earnings.

Most importantly, petitioner's earnings in the years preceding the split-off were substantially attributable to Arnold's oral agreement with Mr. Mattus and his relationship with the supermarkets. As we have found, the supermarket distribution rights were personal to Arnold and did not belong to petitioner. The assumption underlying a capitalization of earnings approach is that, barring adverse developments, the historical earnings will continue. Therefore, in valuing petitioner as of the time of the split-off, which marks the parting of the ways between petitioner and Arnold, an adverse development indeed, it makes no sense to assume that petitioner's earnings would continue at the same level in the future, or even that there would be no more than a pro rata reduction of such earnings by reason of Arnold's departure.

Under the circumstances of this case, where there was a heavy investment in physical assets during a period when the corporation had been unable to pay dividends, an absence of a second tier of

management, a lack of diversification in business, an overdependence on one supplier, Häagen-Dazs, and on one primary "rainmaker", Arnold, who was leaving, the risk of petitioner's being completely eliminated from business as an independent wholesale distributor, the effective veto Häagen-Dazs had over any sale to a third party, the fact that petitioner is a closely held, family-owned business, and the declining ratio of net income to sales, we find that a value of $276,509 is the upper limit to a fair estimate of the value of petitioner immediately prior to the transactions at issue.

Respondent's determination of the value of assets sold to Häagen-Dazs by SIC, and the corresponding value of SIC stock distributed to Arnold, is presumptively correct, and the burden of proving a lower value rests on petitioner. Rule 142(a); Frazee v. Commissioner, 98 T.C. 554, 562 (1992); Pessin v. Commissioner, 59 T.C. 473, 480 (1972). In the present case, respondent did not present the testimony or report of an expert upon which to consider an alternative valuation. Petitioner, on the other hand, did present the report and testimony of Mr. Bergwerk, and has thereby effectively rebutted respondent's original determination. Although Mr. Bergwerk's methodology was flawed, his conclusion is only erroneous insofar as his $276,509 value for petitioner results in an overstatement of the fair market value of the SIC stock distributed to Arnold. Petitioner has carried its burden of reducing respondent's determination of $1,430,340 to $141,000 (51 percent of the value of petitioner) but has not carried the burden of reducing the value any further. See Hess v. Commissioner, 24 B.T.A. 475, 478 (1931) (Court adopted taxpayer's

asserted value where the Commissioner introduced no evidence to rebut taxpayer's expert testimony, citing Baldwin v. Commissioner, 10 B.T.A. 1198 (1928)); cf. Anselmo v. Commissioner, 80 T.C. 872, 886 (1983), affd. 757 F.2d 1208 (11th Cir. 1985); Estate of Trompeter v. Commissioner, T.C. Memo. 1998-35. Taking into account Mr. Bergwerk's valuation conclusion, we find that the fair market value of Arnold's 51-percent interest in petitioner, which petitioner redeemed for all of SIC's stock, was $141,000.[32]

---

[32] Respondent argues that petitioner, under the rule of Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965), cannot unilaterally vary the terms of a contract for tax purposes and must therefore abide by the terms of the sale to Häagen-Dazs in determining the value of assets distributed to SIC and, in turn, the value of SIC stock distributed to Arnold.

As we stated in Hospital Corp. of Am. v. Commissioner, T.C. Memo. 1996-559:

> As we understand the Danielson rule, it is not applicable where the parties have not established the fair market value of the property at the time agreement is adopted because, under those circumstances, there is no agreement to which a party may be held. See Campbell v. United States, 228 Ct. Cl. [661,] 675-677 (1981); * * * see also Commissioner v. Danielson, 378 F.2d 771, 778 [(3d Cir. 1967)] ("it would be unfair to assess taxes on the basis of an agreement the taxpayer did not make"). Furthermore, the Danielson rule is not applicable if the contract is ambiguous. See North American Rayon Corp. v. Commissioner, 12 F.3d [583,] 589 [(6th Cir. 1993), affg. T.C. Memo. 1992-610] ("the Danielson rule does not apply if there is no contract between the parties or if the contract is ambiguous"). * * *

The allocation by the sale agreement of the $1,430,340 sales price paid by Häagen-Dazs to SIC and Arnold between "Sellers' Rights", $1,144,272, and the records, $286,068, is not an agreement made by petitioner as to the value of SIC stock. At

(continued...)

d.  Petitioner's Tax Liability Under Section 1374

Section 1363(a) provides that, generally, S corporations are not subject to income tax.  However, when a former C corporation such as MIC elects S corporation status and then distributes or sells appreciated property, it may be liable for tax under section 1374 if the S corporation election was made prior to January 1, 1987.  TRA sec. 633(b), 100 Stat. 2277; H. Conf. Rept. 99-841 (Vol. II), at II-203 (1986), 1986-3 C.B. (Vol. 4) 1, 203.  Petitioner is a former C corporation that elected S status prior to January 1, 1987.

Section 1374, as applicable to petitioner for the year in issue, reads in pertinent part:

>    SEC. 1374(a).  General Rule.--If for a taxable year of an S corporation--
>
>        (1) the net capital gain of such corporation exceeds $25,000, and exceeds 50 percent of its taxable income for such year, and
>
>        (2) the taxable income of such corporation for such year exceeds $25,000,
>
>    There is hereby imposed a tax (computed under subsection (b)) on the income of such corporation.

---

[32](...continued)
best it is an ambiguous indication.  Furthermore, because petitioner was not a party to the transaction with Häagen-Dazs, the Danielson rule does not apply.

MIC cannot be held to an allocation that it did not bargain for with a party with opposing interests in an arm's-length negotiation.  Neither MIC, SIC, nor Arnold actively negotiated the allocation with Häagen-Dazs.  It remained unchanged from the June 2 draft agreement through the closing of the sale on July 22.  See Particelli v. Commissioner, 212 F.2d 498, 501 (9th Cir. 1954), affg. a Memorandum Opinion of this Court dated Feb. 20, 1952; Berry Petroleum Co. & Subs. v. Commissioner, 104 T.C. 584, 615 (1995).

* * * * * * *

(d) Determination of Taxable Income.--For purposes of this section, taxable income of the corporation shall be determined under section 63(a) without regard to--

(1) the deduction allowed by section 172 (relating to net operating loss deduction), and

(2) the deductions allowed by part VIII of subchapter B (other than the deduction allowed by section 248, relating to organization expenditures).

In order for section 1374 to apply, petitioner must have recognized "net capital gain", which means the excess of net long-term capital gain over net short-term capital loss, as defined in section 1222. Given that petitioner reported no capital gains or losses on its 1988 income tax return, in order for section 1374 to apply, petitioner's distribution of SIC stock to Arnold must have resulted in a long-term capital gain, exceeding $25,000. This, in turn, requires that SIC stock be a capital asset in the hands of petitioner and that petitioner be deemed to have held the SIC stock longer than 1 year. See sec. 1222(3), as amended by sec. 1402(a), Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1731.

The SIC stock was a capital asset in the hands of petitioner. Arkansas Best Corp. v. Commissioner, 485 U.S. 212, 222-223 (1988). Petitioner relies on section 1221(3) to argue that the business records of MIC, which were subsequently transferred to SIC, are not capital assets, and that the SIC stock received in exchange is consequently also not a capital asset. Section 1221(3) provides that the term "capital asset" does not include "a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar

property, held by --(A) a taxpayer whose personal efforts created such property".  Section 1253(c) extends the exception to property whose basis is determined by reference to the basis of such property in the hands of a taxpayer as described in subparagraph (A) of section 1221(3).  We do not agree with petitioner.  The legislative history of section 117(a)(1)(C) of the 1939 Internal Revenue Code, the predecessor to section 1221(3), states that the exception was intended to deal with the writing of books and other artistic works in a very narrow sense.  See S. Rept. 2375, 81st Cong., 2d Sess. 43-44 (1950), 1950-2 C.B. 483, 543-544; S. Rept. 91-552, at 198-199 (1969), 1969-3 C.B. 423, 549-550 (discussing the addition of "letters, memorandums, papers, etc." to section 1221(3) under the Tax Reform Act of 1969, Pub. L. 91-172, sec. 514(a), 83 Stat. 643); see also Commissioner v. Ferrer, 304 F.2d 125, 132 (2d Cir. 1962), revg. in part and remanding 35 T.C. 617 (1961).  MIC's business records do not fall under the narrow category of assets described in section 1221(3).

Second, petitioner is deemed to have held the SIC stock for more than 1 year.  Respondent acknowledged that petitioner's transfer of assets in exchange for the stock of SIC qualified for nonrecognition under section 351.  See supra p. 46.  Under sections 1223 and 358, where a taxpayer has transferred property in a transaction that qualifies for nonrecognition under section 351, the taxpayer's holding period in the stock received in the transaction includes the period for which the taxpayer has held the property transferred in the transaction.  Petitioner's holding period in SIC stock therefore

includes the period it held the assets transferred to SIC. Petitioner presented no evidence to establish that its holding period of the assets, or any part of the assets, transferred to SIC was less than 1 year. Inasmuch as petitioner has the burden of proof on this issue and has presented no evidence, we accept respondent's determination that the gain realized by petitioner was a long-term capital gain.

Petitioner's long-term capital gain of $141,000, resulting from petitioner's distribution of SIC stock in redemption of Arnold's stock in petitioner, is petitioner's only capital gain in 1988. Accordingly, petitioner had "net capital gain" (as defined in section 1222) for purposes of section 1374. When the $141,000 of capital gain is included, petitioner's net capital gain exceeds $25,000 and also exceeds 50 percent of petitioner's taxable income for 1988, as defined in section 1374(d).[33] Accordingly, petitioner satisfies the requirements of section 1374(a) and is liable for tax imposed by section 1374(b) on its recognized gain of $141,000.

5. Additions to Tax

a. Negligence

For taxable year 1988, section 6653(a)(1) adds to tax an amount equal to 5 percent of an underpayment of tax required to be shown on the return that is due to negligence or disregard of rules or regulations. Sections 6653(c)(1) and 6212 essentially define an

_____

[33] Petitioner reported an ordinary loss of $278 on its Form 1120S filed for the 1988 taxable year. Petitioner's 1988 taxable income did not include any net operating loss deductions pursuant to sec. 172, nor any deduction for organization expenditures allowed by sec. 248.

underpayment for purposes of this section as the equivalent of a deficiency.

Section 6653(a)(3) provides that negligence includes "any failure to make a reasonable attempt to comply with the provisions of this title, and the term 'disregard' includes any careless, reckless, or intentional disregard."  Courts have defined negligence as the lack of due care or failure to do what an ordinarily prudent person would do under the circumstances.  Bassett v. Commissioner, 67 F.3d 29, 31 (2d Cir. 1995), affg. 100 T.C. 650 (1993); Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part 43 T.C. 168 (1964).  Petitioner bears the burden of showing that it was not negligent.  Rule 142(a); Goldman v. Commissioner, 39 F.3d 402, 407 (2d Cir. 1994), affg. T.C. Memo. 1993-480.

In United States v. Boyle, 469 U.S. 241, 251 (1985), the Supreme Court held that "When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice."  Ordinary business prudence or due care does not demand that a taxpayer seek a second opinion, id., so long as such advice is reasonable under the circumstances and is based on full disclosure by the taxpayer, see, e.g., Sim-Air, USA, Ltd. v. Commissioner, 98 T.C. 187, 201 (1992) (reliance on tax professional's advice was reasonable when a corporate subsidiary failed to qualify as a DISC when the advice turned out to be erroneous, especially in light of the complexity of section 992 and associated regulations).

In this case, Martin, as president of petitioner, and Arnold both relied on legal advice from Mr. Hewit throughout the protracted negotiations with Häagen-Dazs. Even though Mr. Hewit never gave a written tax opinion to petitioner or Arnold or Martin, Martin and petitioner were entitled to rely and proceed on the assumption that the transactions at issue were nontaxable to petitioner because of the way Mr. Hewit had structured the transactions and drafted the documents effecting the transactions that separated the two business lines. Mr. Hewit, in turn, sought advice from third-party tax professionals on how to structure a tax-efficient solution to resolve the growing dispute between Martin and Arnold over the future direction of petitioner as an ice cream distributor. Like the advice sought by the taxpayer in Sim-Air, USA, Ltd. v. Commissioner, supra at 201, the advice that petitioner sought from Mr. Hewit, who in turn also sought expert advice, was subject to section 355, a complex section of the Code.[34] We find that Martin and petitioner acted as ordinarily prudent business persons would under the circumstances and that petitioner is not liable for an addition to tax under section 6653(a)(1).

b.  Substantial Understatement

For tax year 1988, section 6661(a) provides for an addition to tax of "25 percent of the amount of any underpayment attributable" to "a substantial understatement of income tax for any taxable year", for

---

[34] We note the recent debate over the amendment to sec. 355 enacted in sec. 1012, Taxpayer Relief Act of 1997, Pub. L. 105-34, 111 Stat. 788, 914.

penalties assessed after October 21, 1986.  Section 6661(b)(1) defines a substantial understatement as any understatement that exceeds the greater of $10,000 in the case of corporations, sec. 6661(b)(1)(B), or 10 percent of the tax required to be shown on the return for the taxable year, sec. 6661(b)(1)(A)(i).  An understatement of income tax occurs when the tax actually shown on the return is less than the amount required to be shown on the return.  Sec. 6662(b)(2); Woods v. Commissioner, 91 T.C. 88, 95 (1988).  Petitioner bears the burden of proving that respondent's determination of the deficiency, the understatement with respect to the deficiency, and the addition to tax based on the understatement are erroneous.  Rule 142(a); Conti v. Commissioner, 39 F.3d 658, 664 (6th Cir. 1994), affg. on this issue and remanding 99 T.C. 370 (1992).

Section 6661(b)(2)(B) provides a means to reduce the amount of the addition to tax, stating that

> The amount of the understatement * * * shall be reduced by that portion of the understatement which is attributable to--
>
>> (i) the tax treatment of any item by the taxpayer if there is or was substantial authority * * *, or
>
>> (ii) any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return.

Petitioner failed to disclose on its 1988 return or in a statement attached to the return, as required by section 1.6661-4, Income Tax Regs., the existence of its transfer of assets to SIC and its distribution of SIC stock to Arnold in redemption of his stock in

petitioner.  We note that sections 1.368-3(a), 1.355-5(a), and 1.351-3(a), Income Tax Regs., also require disclosure of all plans of reorganization, distributions of stock of a controlled subsidiary, and transfers to controlled corporations, respectively.  Because petitioner failed to disclose the transactions at issue on its 1988 income tax return, the understatement may not be reduced on the ground of adequate disclosure.  Sec. 6661(b)(2)(B)(ii); sec. 1.6661-4, Income Tax Regs.

Substantial authority is defined in section 1.6661-3(a)(2), Income Tax Regs., as

> less stringent than a "more likely than not" standard (that is, a greater than 50-percent likelihood of being upheld in litigation), but stricter than a reasonable basis standard (the standard which, in general, will prevent imposition of the penalty under section 6653(a), relating to negligence or intentional disregard of rules and regulations).  Thus, a position with respect to the tax treatment of an item that is arguable but fairly unlikely to prevail in court would satisfy a reasonable basis standard, but not the substantial authority standard.

With respect to the issue of whether <u>Commissioner v. Court Holding Co.</u>, 324 U.S. 331 (1945), controls the transactions in question, petitioner has prevailed and thus had substantial authority for its position with respect to the form of the transactions.  Sec. 1.6661-3(a)(2), Income Tax Regs.

Petitioner has not prevailed on the issue of whether section 355 confers nonrecognition of gain realized in the split-off.  Petitioner must therefore demonstrate that substantial authority supports the positions taken on the income tax return with respect to those transactions.  <u>Gallade v. Commissioner</u>, 106 T.C. 355, 367 (1996); sec.

1.6661-3(b)(1), Income Tax Regs.  Petitioner cited no case law or regulations in support of its position.  Petitioner has cited as substantial authority only the advice given by its hired professionals.  Advice of hired professionals, even when reasonable under the circumstances--and regardless of the form in which it is rendered--does not constitute substantial authority.  Gallade v. Commissioner, supra at 367; sec. 1.6661-3(b)(2), Income Tax Regs. Indeed, in light of the facts in this case, the weight of authority directly supported respondent on the issue of "active conduct of a trade or business".  Sec. 355(a)(1)(C) and (b).  Petitioner did not have substantial authority for taking a position that the split-off qualified for nonrecognition of gain under section 355.

Section 6661(c) authorizes the Commissioner to waive "all or any part of the addition to tax * * * on a showing by the taxpayer that there was reasonable cause for the understatement (or part thereof) and that the taxpayer acted in good faith."  While the authority to waive the section 6661(a) addition to tax rests with the Commissioner and not with this Court, we review a denial of waiver by the Commissioner under the abuse of discretion standard.  Gallade v. Commissioner, supra at 367-368; Mailman v. Commissioner, 91 T.C. 1079, 1084 (1988).

We find no evidence in the record that petitioner ever requested a waiver.  Accordingly, as we noted in Alondra Indus., Ltd. v. Commissioner, T.C. Memo. 1996-32, and Brown v. Commissioner, T.C. Memo. 1992-15, "we cannot find that respondent abused his discretion

when the petitioner never requested respondent to exercise it."  See

also <u>McCoy Enters., Inc. & Subs. v. Commissioner</u>, 58 F.3d 557, 563

(10th Cir. 1995), affg. T.C. Memo. 1992-693; <u>Estate of Reinke v.</u>

<u>Commissioner</u>, 46 F.3d 760, 765-766 (8th Cir. 1995), affg. T.C. Memo.

1993-197; <u>Mailman v. Commissioner</u>, <u>supra</u> at 1082-1084; <u>Dugow v.</u>

<u>Commissioner</u>, T.C. Memo. 1993-401, affd. without published opinion 64

F.3d 666 (9th Cir. 1995); <u>Klieger v. Commissioner</u>, T.C. Memo.

1992-734; sec. 1.6661-6, Income Tax Regs.; cf. <u>Gallade v.</u>

<u>Commissioner</u>, <u>supra</u> at 369 (citing <u>Estate of Reinke v. Commissioner</u>,

<u>supra</u> at 765, for the proposition that, while the existence of "a

taxpayer's request for a waiver can establish the Commissioner's

degree of fault for failing to waive, it [<u>Estate of Reinke</u>] does not

hold that a request is a requirement or prerequisite for a waiver.").[35]

Even if petitioner had requested a waiver, we would hold that

petitioner has not established that respondent would have committed an

abuse of discretion in refusing the request.  In this case, petitioner

would have been required to show that reliance on the professional

advice of Mr. Hewit was reasonable and that petitioner acted in good

faith under the circumstances.  Sec. 1.6661-6(b), Income Tax Regs.

While we have held that petitioner has established, by the

preponderance of the evidence, that it was not negligent for purposes

---

[35] Under sec. 6664(c) of the current law, the Omnibus Budget
Reconciliation Act of 1989, Pub. L. 101-239, sec. 7721(a), 103
Stat. 2398, effective for returns with a due date after Dec. 31,
1989, the Commissioner no longer has this discretion, and no
penalty may be imposed for understatements if the taxpayer can
show that it had reasonable cause for the understatement and that
it acted in good faith.

of section 6653(a), the evidence before us on that issue was not completely uncontroverted, especially in light of petitioner's failure to disclose the split-off on its 1988 income tax return.  We therefore cannot say that reasonable cause and good faith were so clear that any refusal by respondent to waive the addition to tax would have amounted to an abuse of discretion as being without sound basis in fact.  See, e.g., Vandeyacht v. Commissioner, T.C. Memo. 1994-148; Klavan v. Commissioner, T.C. Memo. 1993-299.

Accordingly, we sustain respondent's determination that petitioner is liable for the section 6661(a) addition to tax on the underpayment.

To reflect the foregoing,

Decision will be entered under Rule 155.