T.C. Summary Opinion 2003-27


UNITED STATES TAX COURT


S.W. DEPASTURE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 615-00S.              Filed March 26, 2003.


<u>L. Andrew Smith</u>, for petitioner.

<u>Brandi B. Darwin</u>, for respondent.


CARLUZZO, <u>Special Trial Judge</u>:  This case was heard pursuant
to the provisions of section 7463 of the Internal Revenue Code in
effect at the time the petition was filed.  Except for section
6015[1] and unless otherwise indicated, subsequent section

---

[1] Sec. 6015 was added to the Internal Revenue Code by the
Internal Revenue Service Restructuring and Reform Act of 1998,
Pub. L. 105-206, sec. 3201(a), 112 Stat. 734, effective for any
liability for tax arising after July 22, 1998, and any liability
for tax arising on or before July 22, 1998, but remaining unpaid
as of July 22, 1998.

references are to the Internal Revenue Code in effect for the years in issue.  Rule references are to the Tax Court Rules of Practice and Procedure.  The decision to be entered is not reviewable by any other court, and this opinion should not be cited as authority.

Respondent determined deficiencies in, and penalties with respect to, petitioner's Federal income taxes as follows:

| Year | Deficiency | Sec. 6662(a) Penalty |
|------|-----------|----------------------|
| 1994 | $20,184   | $4,005               |
| 1995 | 29,432    | 5,886                |

The issues for decision for each year are:  (1) Whether shareholder pro rata income from an S corporation is understated on the joint Federal income tax return filed by petitioner and his former spouse; (2) whether petitioner qualifies for relief from liability under section 6015; and (3) whether the underpayment of the tax required to be shown on petitioner's return is a substantial understatement of income tax.

Background

Some of the facts have been stipulated and are so found. At the time the petition was filed, petitioner resided in Valdosta, Georgia.

Petitioner is, and was during all relevant times, a certified welder.  During each year in issue, petitioner was employed as a welder by, among other employers, Certified Welding Services, Inc. (CWS), a Georgia corporation that he organized

and incorporated. In 1984, CWS made an S election, see sec. 1361, that remained in effect for the years in issue.

Petitioner married Madris Gutierrez (Ms. Gutierrez) in 1975. They remained married to each other throughout the years in issue, they separated during 1996, and they were divorced in 1997.

At one time, petitioner and Ms. Gutierrez owned all of the stock of CWS. Some time after the corporation was organized, however, petitioner and Ms. Gutierrez were advised that the corporation would enjoy certain competitive business advantages if all of its stock were held in her name. Consequently, prior to 1994, petitioner transferred his stock in CWS to Ms. Gutierrez. In the divorce proceeding, CWS was described as petitioner's business and, in 1997, in connection with that proceeding, all of the stock in CWS was transferred to petitioner.

Prior to and during his marriage to Ms. Gutierrez, and before CWS was formed, petitioner was involved in various other welding businesses. In connection with each business, he provided services as a certified welder. Ms. Gutierrez is not a welder and except for CWS has no experience in welding businesses; prior to CWS she was employed as a computer operator for various companies. Sometime before 1987, Ms. Gutierrez also began writing romance novels. In 1996, she founded New Concepts

Publishing (NCP), an electronic publishing company dedicated to acquiring the rights to romance novels delivered over the Internet.

Regardless of who owned its stock at any given time, CWS functioned, more or less, in the same way from its inception at least through the years in issue. Through its employees, which at all times included petitioner and from time to time other welders, CWS provided welding services to companies involved in the construction industry. CWS competed for and was awarded contracts at times as a result of petitioner's reputation in the industry and at other times based upon estimates or bids prepared by petitioner. CWS's ability to generate income depended upon petitioner's efforts to secure contracts and provide the necessary welding services in accordance with such contracts.

For the most part, the construction projects involving CWS and petitioner were located throughout the United States, usually a substantial distance from where he maintained his residence at the time. Consequently, petitioner spent a significant portion of any given year traveling away from home as an employee of CWS. This was true in 1994, but because he was in the process of building a personal residence during 1995, petitioner's travel as an employee of CWS was greatly reduced that year.

Although an employee of CWS, petitioner was not paid a salary or wages for his services by that company.  The method by which he was compensated for the welding services he performed is not entirely clear from the record, but it appears that from time to time he was paid in accordance with union wage standards by the contractor (or subcontractor) that had contracted with CWS.  Petitioner's traveling expenses (transportation, meals, lodging, etc.) in connection with any particular construction project that he was working on were paid or reimbursed by CWS.  CWS also provided petitioner with a truck, welding rigs, and various other tools.

CWS maintained at least two checking accounts during the years in issue.  Presumably, some of the income that CWS received from various contracts was deposited into these accounts.  In general, the traveling expenses incurred by petitioner as an employee of CWS were paid or reimbursed by checks drawn on one of CWS's accounts.  These checks were usually made payable to "cash".  Various other checks were drawn on these accounts, some for equipment, some for supplies, some for wages for individuals other than petitioner, and some for food and other personal items consumed or used by petitioner and members of his family.[2]  Some of the checks made payable to "cash" were not necessarily used to

_____

[2] Some of these items were paid for directly, others were purchased by credit card, and the credit card bill was paid by CWS check.

pay or reimburse petitioner for traveling expenses. Most of the checks drawn on the accounts were prepared and signed by Ms. Gutierrez, but it appears that certain checks, although signed by Ms. Gutierrez, were actually prepared by someone else. Some checks, including checks made payable to cash, were signed by petitioner.

In 1993, CWS purchased 94 acres (approximate area, including dry land and a lake) in Madison, Florida, for $65,550[3] (the Mystic Lake property or the property). When purchased, the Mystic Lake property contained four dilapidated structures that previously had been used as a motel.[4] Petitioner and Ms. Gutierrez, who were then living in Georgia, intended to construct a personal residence in the likeness of a medieval castle on the property. They renovated three of the four existing structures to a condition that allowed each to be used as a residence by petitioner, Ms. Gutierrez, and other members of their family while the "castle" residence was being built. Renovations on the fourth structure were completed by early 1995. As of March 1995,

---

[3] There is some question as to whether the purchase price was $65,000, as indicated by each party's expert, or $65,550, as stipulated by the parties. Because the parties have stipulated to the adjusted basis of the property, the discrepancy is of no significance.

[4] Apparently these structures were in such poor condition that the local real estate assessment authority had removed them from the real estate tax rolls.

a substantial sum[5] had been expended in connection with these renovations.

On March 2, 1995, CWS distributed the Mystic Lake property to the petitioner and Ms. Gutierrez (the distribution). Soon thereafter, petitioner and Ms. Gutierrez obtained a $300,000 construction loan from Barnett Bank to fund the construction of the castle residence that they intended to build on the property. As of the close of 1995, the castle residence was substantially completed.

Petitioner and Ms. Gutierrez filed a timely joint Federal income tax return for each year in issue. Each return was prepared by John D. Gaskins,[6] a certified public accountant whose license was later revoked because he was convicted of Federal income tax evasion. Income of $64,400 is reported on petitioner's 1994 return, which income consists of $34,635 of shareholder pro rata income from CWS, $29,546 of wages; and $219 of interest. Income of $33,461 is reported on petitioner's 1995 return, which income consists of $18,259 of shareholder pro rata

---

[5] The parties stipulated that the basis of the Mystic Lake property had increased by $63,949 as of March 1995. As best as can be determined from the record, the addition to the property's basis is attributable to the improvements made to the four existing structures. Some of the expenditures now included in the property's basis apparently gave rise to deductions claimed by CWS and disallowed by respondent.

[6] Mr. Gaskins was also involved as a principal with petitioner in various welding businesses.

income from CWS, $14,095 of wages, $178 of interest, and $929 of capital gains. The distribution is not disclosed on their 1995 joint return.

CWS filed a timely Form 1120S, U.S. Income Tax Return for an S Corporation, for 1994 and 1995. Each return was prepared by Mr. Gaskins and signed by Ms. Gutierrez as CWS's president. Some of the expenditures made in connection with renovations made to existing buildings on the Mystic Lake property were claimed as business expense deductions on CWS's returns for 1994 and 1995. Some of the expenditures made in connection with the construction of the castle residence were also claimed as business expense deductions on CWS's 1995 return. The income reported on CWS's 1995 return did not include income attributable to the distribution, nor was the distribution otherwise disclosed on that return.

Respondent examined the 1994 and 1995 returns of CWS and, as a result, disallowed various business expense deductions claimed on each return. For 1995, respondent also determined that CWS realized a capital gain of $102,939 from the distribution.[7]

_____

[7] Computed as follows in the notice of deficiency:

| Fair market value of Mystic Lake property as of Mar. 2, 1995: | $168,489 |
| Minus adjusted basis: | (65,550) |
| Capital gain: | 102,939 |

These adjustments form the basis of the adjustments to the shareholder pro rata income of CWS here in dispute.  For each year in issue, respondent also determined that the underpayment of tax required to be shown on petitioner's return is due to negligence and/or a substantial understatement of income tax.

Discussion

1.  Shareholder Pro Rata Income From CWS

Petitioner now agrees that the shareholder pro rata income from CWS reported on his return for each year is understated and that the understatement is measured by the disallowed business expense deductions claimed by CWS.  Furthermore, although he disputes respondent's computation of the amount, petitioner now agrees that CWS realized capital gain income from the distribution of the Mystic Lake property, see secs. 311(b), 1371(a); Martin Ice Cream Co. v. Commissioner, 110 T.C. 189, 219-220 (1998); Eustice & Kuntz, Federal Income Taxation of S Corporations, par. 1.03(2)(d)(ii), at 1-61, par. 8.02(1)(a), at 8-24, par. 8.04(9), at 8-79 (4th ed. 2001), and that a like amount of capital gain should have been included in the shareholder pro rata income reported on petitioner's 1995 Federal income tax return.  According to petitioner, however, respondent's computation of the capital gain is overstated because respondent overstated the fair market value of the property and understated the adjusted basis of the property.

The parties now agree that the adjusted basis in the Mystic Lake property as of the date of the distribution was $129,499. Consequently, we turn our attention to the fair market value of that property as of the date it was distributed.

Each party employed a valuation expert to determine the fair market value of the Mystic Lake property as of March 2, 1995. Both experts appraised the land separately from the improvements, and each expert relied, at least in part, on comparable sales in formulating his opinion of the property's fair market value.

According to petitioner's expert, James Searcy, the fair market value of the Mystic Lake property as of the date of the distribution ranged from $104,444 (income approach) to $135,780 (cost minus depreciation approach, allocating $77,000 to land and $58,780 to improvements). Mr. Searcy determined that the "final reconciliation of value" was $125,000, which also represented his estimate of the property's fair market value using the market approach to valuation. In arriving at his cost estimate of value, Mr. Searcy used the cost minus depreciation approach. He estimated the replacement cost of the three small structures to be $137,700, but reduced this amount by 60 percent to $55,080 to account for depreciation. Mr. Searcy considered the largest of the four structures located on the property to be functionally obsolete on the date of the distribution and assigned no value to that structure. Applying the allocation between land and

improvements as set forth in Mr. Searcy's "cost approach to value" to his "final reconciliation of value" of $125,000 results in an allocation between land and improvements in the respective amounts of $70,887 and $54,113.

According to respondent's expert, Harry Smith, the fair market value of the Mystic Lake property as of the date of the distribution was $168,489, allocated between land and improvements in the respective amounts of $48,102 and $120,387. Mr. Smith estimated the fair market value of the largest of the four structures to be $38,670.

Respondent's estimate of the fair market value of the Mystic Lake property as of the date of the distribution exceeds petitioner's estimate by $43,489.[8] This difference is the result of several factors; however, it closely approximates the value of the largest of the four structures as valued by Mr. Smith. Mr. Searcy assigned no value to this structure because he determined that it was functionally obsolete on the relevant date.

As we view the matter, petitioner's expert erred by failing to assign any value to the largest of the four structures located on the property. Other evidence in the record, including petitioner's testimony, demonstrates that this building had been renovated and was in use at the time the property was

---

[8] Curiously enough, petitioner's estimate of the fair market value of the land is actually higher than respondent's estimate of the value of the land.

distributed. We could accept petitioner's estimate of the value of the land and respondent's estimate of the value of the improvements, except by doing so the overall value would then exceed the estimate of each party.

Under the circumstances, we accept respondent's estimate of the fair market value of the Mystic Lake property. In so doing we find the resulting capital gain realized by CWS to be $38,990 ($168,489 fair market value as determined here, minus $129,499 adjusted basis of the property, as stipulated). Therefore, in accordance with the foregoing, we sustain respondent's determination that shareholder pro rata capital gain income from CWS is understated on petitioner's 1995 return. In addition, we sustain respondent's determination that shareholder pro rata ordinary income from CWS is understated on petitioner's return for each year in issue.

2.  Claim for Relief Under Section 6015

In general, "spouses filing a joint tax return are each fully responsible for the accuracy of their return and for the full tax liability." Butler v. Commissioner, 114 T.C. 276, 282 (2000); see sec. 6013(d)(3). "Section 6015, however, provides various means by which a spouse can be relieved of this joint and several obligation." Alt v. Commissioner, 119 T.C. 306, 311 (2002). Petitioner makes a claim for such relief in this case under section 6015(c) and (f) in the petition filed in this case.

Except as otherwise provided in section 6015(c), petitioner bears the burden of proof that he is entitled to section 6015 relief. See Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).

<u>Request for Relief Under Section 6015(c)</u>

Section 6015(c) limits an individual's liability for any deficiency to the portion of the deficiency properly allocable to that individual under section 6015(d). In general, an item that gives rise to a deficiency on a joint return will be allocated to the individuals who file the return in the same manner as that item would have been allocated had those individuals filed separate returns. See sec. 6015(d)(3)(A). Relief under section 6015(c) is subject to various conditions, all of which have been satisfied in this case. See sec. 6015(c)(1), (3)(A)(i).

In support of his claim for relief under section 6015(c), petitioner argues that pursuant to section 6015(d), all of the shareholder pro rata income attributable to CWS is allocable to Ms. Gutierrez during the years in issue because during those years she was the sole shareholder of CWS. See sec. 6015(c)(2). Assuming, without finding, that petitioner is correct in this regard,[9] we consider whether petitioner's claim for relief is precluded by the provisions of section 6015(c)(3)(C), which, except under circumstances not relevant here, provides that relief under section 6015(c) is not available if the Commissioner

---

[9] Respondent does not contend that Ms. Gutierrez was petitioner's nominee with respect to her stock in CWS.

demonstrates that the individual who seeks such relief has actual knowledge at the time the individual signed the return of any item giving rise to a deficiency.

According to petitioner, he was unaware that Ms. Gutierrez's shareholder pro rata share of CWS's income was not properly reported on their joint Federal income tax return for either year in issue. Petitioner further maintains that Ms. Gutierrez, as the corporation's sole shareholder and president, rather than himself, ran CWS and had exclusive control over the corporation and corporate funds. However, petitioner's professional background, his involvement in the construction industry over the years, and his connection with CWS greatly undermine petitioner's claim on this point, which, for the following reasons, we reject.

Petitioner organized CWS in 1984. He is a certified welder by profession, and CWS is a welding services company that functioned through petitioner. Prior to the organization of CWS, petitioner was involved in other welding operations. Ms. Gutierrez is not a welder and, except for her involvement with CWS through her relationship with petitioner, has no practical experience in the welding services industry. Ms. Gutierrez's primary vocational interest before, during, and after the years in issue was writing and publishing romance novels. She came to be sole shareholder and president of CWS only because of her relationship with petitioner. Furthermore, she was CWS's sole

shareholder so that the corporation might compete successfully for certain contracts.

Notwithstanding the transfer of legal ownership of CWS to Ms. Gutierrez, petitioner continued to prepare CWS bids for welding projects and secure welding contracts based on his reputation in the welding industry. It was his knowledge that enabled CWS to compete for and obtain contracts. No doubt, Ms. Gutierrez was, to some extent, active in the corporation. She arranged for the filing of the corporate income tax returns and paid corporate bills. But it appears that she did what she did as a convenience to petitioner who was frequently away from home working on contracts he secured for CWS. Petitioner negotiated the income-generating contracts that CWS was awarded; he worked on the jobs pursuant to those contracts; and he must have been aware of the profitability of each job and the overall financial situation of CWS. Furthermore, having drawn no compensation from CWS during the years in issue, he also must have been aware that the corporation was paying for a variety of his and his family's personal expenses, including the renovations of the existing structures and the construction of the castle residence on the Mystic Lake property.

Petitioner's actual connection with CWS, as opposed to any formal status as a stockholder during the years in issue, is further evidenced by the fact that all of the stock in the

corporation was transferred from Ms. Gutierrez to him pursuant to their marital settlement agreement.

As noted, petitioner was obviously aware that many of his and his family's personal expenses were being paid by CWS during each year in issue. He wrote checks drawn on corporate accounts, and very well might have prepared other checks for the signature of Ms. Gutierrez. He was equally aware that during 1995 CWS transferred the Mystic Lake property to Ms. Gutierrez and himself. We find that respondent has demonstrated that petitioner had actual knowledge that the shareholder pro rata share of CWS's income was not properly reported on his joint Federal income tax return for either year in issue. Consequently, petitioner is not entitled to relief under section 6015(c) for either year, regardless of how items giving rise to the deficiencies would be allocated under section 6015(d).

Request for Relief Under Section 6015(f)

To the extent that petitioner is not entitled to relief under section 6015(c), he requests relief under section 6015(f).

Section 6015(f) allows for relief from joint and several liability stemming from a joint Federal income tax return if, taking into account all of the facts and circumstances, it is inequitable to hold the requesting individual liable for any unpaid tax or any deficiency or any portion thereof. Sec. 6015(f)(1).

As relevant here, a nonexclusive list of factors the Commissioner will consider in allowing relief under section 6015(f) is set forth in section 4.03 of Rev. Proc. 2000-15, 2000-1 C.B. 448. No single factor is determinative; rather, all factors are considered and weighed appropriately. See Mellen v. Commissioner, T.C. Memo. 2002-280; Penfield v. Commissioner, T.C. Memo. 2002-254.

Knowledge of an item giving rise to the deficiency "is an extremely strong factor weighing against relief." Rev. Proc. 2000-15, sec. 4.03(2)(b), 2000-1 C.B. 449. As we have previously discussed, petitioner was aware of the items that give rise to the deficiencies in this case.

Furthermore, relief might not be appropriate under section 6015(f) if the individual who requests such relief benefited from the unpaid liability or items giving rise to the deficiency. See Rev. Proc. 2000-15, sec. 4.03(2)(c), 2000-1 C.B. 449. In this case, petitioner significantly benefited from the items that resulted in the deficiencies here under consideration. Some of his personal and family living expenses were paid by CWS during each year in issue, and, in 1995, he received from CWS an ownership interest in a valuable piece of real estate.

Taking into account all of the facts and circumstances, it would not be inequitable to hold petitioner liable for the deficiencies here in dispute. Consequently, respondent's implicit denial of petitioner's request for equitable relief under section 6015(f) is not an abuse of discretion.

3. Section 6662(a) Penalty

For each year in issue, respondent determined that petitioner is liable for a penalty under section 6662(a). That section imposes an accuracy-related penalty if, among other things, an underpayment of tax required to be shown on a return is a substantial understatement of income tax. Sec. 6662(a) and (b)(2).

In this case, the understatement of income tax for each year in issue is computed in the same manner as and is equal to the deficiency. See sec. 6662(d). We find that, for each year in issue, the understatement of income tax is substantial within the meaning of section 6662(d) because it exceeds the greater of $5,000 or 10 percent of the tax required to be shown on the return for the taxable year. Sec. 6662(d)(1)(A). Consequently, the penalty imposed by section 6662(a) is applicable, and respondent's determination in this regard is sustained for both years.

Reviewed and adopted as the report of the Small Tax Case Division.

To reflect the foregoing,

Decision will be entered

under Rule 155.