T.C. Memo. 2011-196

UNITED STATES TAX COURT

PETER J. VAN WICKLER AND LAURIE E. JANAK, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

PETER J. VAN WICKLER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 24090-07, 24140-07.     Filed August 15, 2011.

Peter J. Van Wickler and Laurie E. Janak, pro sese.

<u>Matthew A. Houtsma</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

FOLEY, <u>Judge</u>:  The issues for decision are whether petitioners are entitled to deduct various expenses and liable for section 6662(a) accuracy-related penalties.[1]

_____

[1]Unless otherwise indicated, all section references are to
(continued...)

FINDINGS OF FACT

From 1997 to 2003, Peter J. Van Wickler managed construction of cellular towers.  Mr. Van Wickler earned stock options, which he exercised in 2000 and 2001, resulting in income of approximately $2,700,000.  In 2000, after divorcing his first wife and paying her a significant portion of his newly acquired wealth, Mr. Van Wickler aggressively sought income-generating opportunities.

In October 2002, John Bristol, Mr. Van Wickler's coworker, introduced Mr. Van Wickler to ClassicStar, LLC (ClassicStar), a company that marketed horse breeding activities to high-net-worth individuals.  ClassicStar touted its history of producing profitable horses as well as the tax benefits of its mare lease program.  ClassicStar described its mare lease program as the "ultimate tax solution" and asserted that the government encouraged these types of investments because horse racing generated Federal and State tax revenues.

On October 30, 2002, Paul Bangerter, a ClassicStar representative, sent Mr. Van Wickler the Due Diligence and Mare Lease Information Booklet (ClassicStar materials), which contained information about ClassicStar, the mare lease program,

[1](...continued)
the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

and favorable tax opinions. The ClassicStar materials described the mare lease program as follows:

> Through ClassicStar's Mare Lease Business you can lease the reproductive capacity of a Thoroughbred mare for a breeding season. The mare is bred to a quality stallion, and the resulting offspring, the foal, belongs to the lessee. Once the foal is born, the breeder has a number of options, including selling the foal as a weanling, a yearling, or a two-year-old; training and racing the foal; or even doing a like-kind, tax-free exchange.

The ClassicStar materials further provided that all of the expenses would be paid up front with loan proceeds, the investor would claim tax deductions, the resulting net operating losses (NOLs) could be carried back to previous years, the investor would collect refunds of previously paid Federal and State taxes, and the refunds could be used to repay the loans.

On October 30, 2002, ClassicStar sent Mr. Van Wickler tables delineating profit projections of the mare lease program, explaining the conversion of the investment to oil and gas interests, and calculating the amount of NOLs needed for Mr. Van Wickler to obtain a refund of Federal and State income taxes paid over the previous 3 years (i.e., $2,689,943 of NOLs).

Mr. Van Wickler believed that he could make a profit through his investment in the mare lease program. He researched ClassicStar and engaged Doug Page, a certified public accountant (CPA), to review the ClassicStar materials. Mr. Page then discussed with Mr. Van Wickler the need for further assurances that the mare lease program could withstand Internal Revenue

Service (IRS) scrutiny, and, after speaking with Terry Green, Mr. Page was convinced that it could. At the time, Mr. Page believed that Mr. Green, a CPA, was independent of ClassicStar.

Mr. Van Wickler financed his entire investment in the mare lease program with three loans. On December 30, 2002, Mr. Van Wickler executed, with National Equine Lending Co. (NELC), a 6-month $1,124,188 promissory note (short-term loan) and a 41-month $1,344,972 promissory note (long-term loan). ClassicStar representatives instructed Mr. Van Wickler to obtain the loans from NELC. Mr. Van Wickler did not submit an application for the loans, which were unsecured and were not signed for by an NELC representative. To satisfy the cash contribution requirement of the mare lease program (cash contribution loan), Mr. Van Wickler obtained a third loan of $220,784 from Logan Richards, LLC. Mr. Bangerter and Larry McNeill operated Logan Richards, LLC, and, in lieu of loan interest, took a 15-percent interest in Mr. Van Wickler's profits in the mare lease program. Mr. Van Wickler, Mr. Bangerter, and Mr. McNeill orally agreed that if Mr. Van Wickler or Mr. Page did not believe, after a scheduled January 2003 meeting, that the mare lease program was legitimate, Mr. Van Wickler's money would be refunded and he could cancel the deal. In addition, if ClassicStar were to go out of business, Mr. Van Wickler would not be liable for the outstanding balance on the short-term and long-term loans. Mr. Van Wickler, Mr. Green, and

Mr. Bangerter orally agreed that no interest would be due on the long-term loan until the horses and oil and gas interests were sold.

Also on December 30, 2002, Mr. Van Wickler, "as managing member of Bent Rock Farms, LLC," executed with ClassicStar a Mare Lease and Breeding Agreement, a Boarding Agreement, a Foal Agreement, and a Nominee Agreement. In the Mare Lease and Breeding Agreement, Mr. Van Wickler agreed to lease mares for 8 months for a $1,488,500 fee, to pay a $715,500 stallion service fee, and to pay a $350,944 prospective foal insurance (PFI)[2] fee. The schedule setting forth the mares and stallions to be leased was blank. In the Boarding Agreement, Mr. Van Wickler agreed to pay a fee of $135,000 for board and care services of Mr. Van Wickler's leased mares for 1 year beginning on November 1, 2002. The Boarding Agreement was silent as to the identity or number of leased mares subject to the agreement.

On January 14, 2003, Mr. Van Wickler and Mr. Page met with several ClassicStar representatives and ClassicStar's president. Following the meeting, Mr. Page told Mr. Van Wickler that he believed the mare lease program was a high-risk, high-reward investment and reiterated his belief that it could withstand IRS

---

[2]Prospective foal insurance covers the risk that an unborn foal will not survive.

scrutiny if Mr. Van Wickler materially participated in the program.

On January 23, 2003, Mr. Van Wickler created Bent Rock Farms, LLC, to invest in ClassicStar. Also on that date, ClassicStar sent Mr. Van Wickler a letter stating that the proceeds from the short-term loan, the long-term loan, and the cash contribution loan paid for $135,000 of board and mare care expenses, $350,944 of PFI, $715,500 of breeding fees, and $1,488,500 of mare lease expenses.

On February 5, 2003, Mr. Van Wickler paid the balance of the cash contribution loan. From April to August 2003, Mr. Van Wickler made payments of $1,124,188 to NELC relating to the short-term loan.

ClassicStar informed Mr. Van Wickler that he had been assigned breeding pairs. Throughout the lease term, ClassicStar substituted horses in and out of Mr. Van Wickler's breeding pairs. At the time he committed to invest in ClassicStar, Mr. Van Wickler, who was unaware of which horses he had leased, believed that all the ClassicStar horses were thoroughbreds. The only thoroughbreds named on the lists of Mr. Van Wickler's breeding pairs, however, were the mare Avenue of Gold and the stallion Fusaichi Pegasus. Mr. Van Wickler's pairings resulted in only one foal. Virtually all of the remaining horses listed

were quarter horses, which were considerably less valuable than thoroughbreds.

In 2004, ClassicStar provided Mr. Van Wickler with several charts which delineated Mr. Van Wickler's breeding pairs, mare lease fees, stallion breeding fees, mare boarding expenses, PFI costs, total costs to produce a foal, and future expenses. The number of horses, breeding pairs, mare lease fees, stallion breeding fees, and PFI costs for particular horses varied among the charts. For example, in 2003, Lita May, who was sold for $350, had a lease fee of $260,723 on one chart and a lease fee of $185,000 on another chart. Two of the charts reflected that the total cost to produce nine foals was $2,689,944, but totals of mare lease fees, stallion breeding fees, and PFI costs differed from list to list (e.g., the total mare lease fee ranged from $1,352,500 to $2,052,104 and the total stallion breeding fee ranged from $99,350 to $853,600). The mare lease fees for each mare ranged from $95,000 to $377,863 and the stallion breeding fees for each stallion ranged from $5,650 to $250,000. Mare boarding expenses were listed at $15,000 per horse on each chart.

In 2003, Mr. Van Wickler timely filed his 2002 Federal income tax return on which he claimed $2,691,405[3] in expenses and

_____

[3]Mr. Van Wickler itemized the horse-related expenses on his Schedule F, Profit or Loss From Farming, of the 2002 return as follows: $454 in car and truck expenses, $350,944 in insurance expenses, $1,488,500 in other expenses, $135,000 in board and

(continued...)

reported NOLs and zero horse breeding activity income (2002 return).  In 2003, Mr. Van Wickler filed amended 2001 and 2002 Federal income tax returns on which he carried back NOLs relating to 2002.  In 2004, Mr. Van Wickler and Laurie E. Janak[4] timely filed a 2003 joint Federal income tax return on which they reported zero income and $46,032 of miscellaneous expenses relating to the horse breeding activity (2003 return).

On July 17, 2007, respondent issued Mr. Van Wickler a notice of deficiency relating to 2000, 2001, and 2002.  On the same day, respondent issued Mr. Van Wickler and Ms. Janak a notice of deficiency relating to 2003.  The notices of deficiency disallowed all horse breeding activity expense deductions and resulting NOLs and imposed section 6662(a) accuracy-related penalties.  On October 19, 2007, petitioners, while residing in Colorado, filed their petitions with the Court.

OPINION

Respondent contends that Mr. Van Wickler is not entitled to deduct horse breeding expenses because Mr. Van Wickler was not in the trade or business of horse breeding and, alternatively, that

------

[3](...continued)
mare care expenses, $715,500 in breeding fees, and $1,007 in travel expenses.

[4]Laurie E. Janak signed the 2003 joint Federal income tax return but had no involvement with the matters at issue.

the expenses relating to the horse breeding activity are unreasonable and therefore not deductible.[5]

Mr. Van Wickler was not involved in the horse breeding activity with continuity or regularity. See Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987). He did not manage or control the day-to-day operations of the activity, did not know which horses he leased, and did not negotiate contract terms or fees relating to the activity. Thus, he was not, pursuant to section 162, carrying on a trade or business. While Mr. Van Wickler does not meet the requirements of section 162, we must determine whether his investment meets the requirements of section 212. Section 212 does not have a trade or business requirement and allows an individual to deduct ordinary and necessary expenses incurred in activities entered into for the production of income. See sec. 212; Snyder v. United States, 674 F.2d 1359, 1364 (10th Cir. 1982). To be "ordinary and necessary", expenses must be "reasonable in amount and must bear a reasonable and proximate relation to the production or collection of taxable income". Sec. 212; sec. 1.212-1(d), Income Tax Regs.

---

[5]Pursuant to sec. 7491(a), Mr. Van Wickler has the burden of proof unless he introduces credible evidence relating to the issue that would shift the burden to respondent. See Rule 142(a). Our conclusions, however, are based on a preponderance of the evidence, and thus the allocation of the burden of proof is immaterial. See Martin Ice Cream Co. v. Commissioner, 110 T.C. 189, 210 n.16 (1998).

To determine whether an expense is reasonable in amount, we must first determine the amount of the expense. Neither Mr. Van Wickler, nor we, could ascertain which horses Mr. Van Wickler leased. On January 23, 2003, ClassicStar provided Mr. Van Wickler with a summary of expenses which he reported on his 2002 return. In 2004, ClassicStar provided Mr. Van Wickler with more detailed expense reports which were vastly different from the previous year's summary. The expense reports set forth a myriad of expenses but were inconsistent and contradictory and did more to obfuscate than to clarify. We cannot conclude that the amounts paid for various services were reasonable if neither we, nor Mr. Van Wickler, know the amounts of those expenses. A deduction cannot stand on so flimsy a foundation. Luman v. Commissioner, 79 T.C. 846, 859 (1982). Even if we concluded that a portion of Mr. Van Wickler's payments was made, pursuant to section 212, for allowable ordinary and necessary expenses, the record fails to provide a rational basis by which we could allocate deductible and nondeductible expenses. See Epp v. Commissioner, 78 T.C. 801, 806 (1982). An allocation of a portion of the payment would be "speculative, amounting to 'unguided largesse.'" Luman v. Commissioner, supra at 859 (quoting Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957)). Accordingly, Mr. Van Wickler is not entitled to deduct expenses relating to the horse breeding activity.

Respondent determined that Mr. Van Wickler is liable for section 6662(a) accuracy-related penalties. Section 6662(a) imposes a penalty equal to 20 percent of the amount of any underpayment attributable to various factors including negligence or a substantial understatement of income tax. See sec. 6662(b)(1) and (2). Negligence includes any failure to make a reasonable attempt to comply with the law or maintain adequate books and records. Sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs. An understatement is substantial if it exceeds the greater of $5,000 or 10 percent of the tax required to be shown on the return. Sec. 6662(d)(1)(A). Although Mr. Van Wickler substantially understated his income tax, section 6664(c)(1) provides that no penalty shall be imposed if there was reasonable cause for the underpayment and the taxpayer acted in good faith.

The determination of whether a taxpayer acted with reasonable cause and in good faith depends upon the facts and circumstances. See sec. 1.6664-4(b)(1), Income Tax Regs. Reliance on professional advice qualifies as reasonable cause and good faith if the reliance was reasonable and the taxpayer acted in good faith. Id. Mr. Van Wickler recognized his unfamiliarity with tax law and approached Mr. Page, a CPA, to analyze the tax aspects of the mare lease program. Mr. Page reviewed the ClassicStar materials including the tax opinions, attended a presentation with ClassicStar executives, spoke with another tax

professional about the ClassicStar program, and prepared the tax returns at issue. Mr. Van Wickler lacked experience and knowledge of tax law, and sought advice from Mr. Page, who was duped by ClassicStar's materials and representatives. We conclude that Mr. Van Wickler in good faith took reasonable efforts to assess his proper tax liability and reasonably relied on Mr. Page's expertise. See <u>Freytag v. Commissioner</u>, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991); sec. 1.6664-4(b)(1), Income Tax Regs. Accordingly, he is not liable for the section 6662(a) accuracy-related penalties.

Contentions we have not addressed are irrelevant, moot, or meritless.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.